**STATE of Missouri, Respondent,**

v.

**Audrey Loretta BATCHELOR, Appellant.**

No. 52676.

Supreme Court of Missouri, Division No. 2.

Oct. 9, 1967.

---

2. State v. Emmons, 285 Mo. 54, 225 S.W. 894, 895 [3].

Norman H. Anderson, Atty. Gen., Jefferson City, Robert D. Kingsland, Special Atty. Gen., Jefferson City, for respondent.

Dan K. Purdy, Pierce, Duncan, Beitling & Shute, Kansas City, for defendant.

PRITCHARD, Commissioner.

For armed robbery a jury found appellant guilty and assessed her punishment at fifteen years' imprisonment in the Department of Corrections. Judgment and sentence followed the overruling of appellant's motion for new trial. Appellant was represented by counsel throughout the trial and the same counsel was appointed by the court for this appeal, appellant being allowed to appeal as a poor person. Before judgment and sentence were imposed, appellant was accorded allocution.

Two points are presented by appellant in seeking reversal and a new trial. The first is that "Instruction No. 2 is fatally defective in that it does not require a finding that the 'money and, or narcotic drugs' allegedly taken were the property of Joe Eisberg, d/b/a Medical Arts Pharmacy as charged in the information and gave the jury a roving commission to convict the appellant of the taking of any money or property belonging to anyone." The second is that "The court erred in failing to sustain defendant's motion to strike testimony as to the identification of the defendant in the lineup when it became apparent that the defendant was the only woman exhibited."

The information did charge the ownership of the property, $140.57 in money and $150.00 value of narcotic drugs (the latter value being added by amendment under the evidence during trial), to be in Joe Eisberg, d/b/a Medical Arts Pharmacy, and that the armed robbery was committed with a loaded .38 calibre Hopkins & Allen revolver upon one Melvin L. Rogers from whom the property was taken. Instruction No. 2 required the finding that appellant "either alone or knowingly acting in concert with another, did feloniously make an assault upon one Melvin L. Roger with a dangerous and deadly weapon, to-wit, a .38 Calibre Hopkins & Allen Revolver, loaded with gunpowder and leaden balls, and took and carried away any money and, or narcotic drugs from his person, or in his presence, and against his will, by force and violence to his person, or by putting him in fear of some immediate injury to his person, with felonious intent to convert the same to her own use, without any honest claim to said money and, or narcotic drugs, and with intent to permanently deprive the said Melvin L. Roger, of his custody and control without the consent of the said Melvin L. Roger, if such be your finding, then you will find the defendant guilty of Robbery, First Degree and so find in your verdict."

Appellant argues that when the allegation is made that the property taken belonged to someone other than the person robbed, it follows that the jury should be required to find the facts as alleged in the information in order to sustain a conviction on that information. As is noted, the information did allege ownership in Eisberg; the uncontroverted evidence was that he owned the property; the information further alleged that the property was taken from Rogers; and the evidence is uncontroverted that Rogers had care and custody of such property. The purpose of alleging, proving and submitting for a finding by the jury of the ownership of property taken in an armed robbery is to show that the same is not in the accused, "as he cannot be held for converting his own property, also to bring notice to the accused of the particular offense for which he is called to answer and to bar subsequent prosecution of the accused for the same offense." State v. Nelson, 362 Mo. 129, 240 S.W.2d 140, 142 [1–3]. This information informs appellant that the property was owned by Eisberg and was taken from

Rogers. The evidence supports the allegation. The instruction, while not precisely and desirably requiring a finding that Eisberg was the true owner, did require a finding that the property was taken by appellant without any *honest claim* thereto, and with intent to permanently deprive the said Melvin L. Rogers of his *custody and control*. This reasonably requires the finding that appellant had no title or ownership, and that Rogers did have some limited rights therein, i. e., care and custody so as to be a special owner with sufficient interest to support a robbery conviction. State v. Johnstone, Mo., 335 S.W.2d 199, 203; State v. Gilliam, Mo., 351 S.W.2d 723, 725; and State v. Wilwording, Mo., 394 S.W.2d 383, 388: " * * * The facts specifically hypothesized in the instruction fairly required a finding that Wilkinson was at least one of those in lawful possession of the money, and that was sufficient." Point I, having no merit, is overruled.

With respect to the second point, the facts bearing thereon and showing also pertinent details of the robbery are:

Joe Eisberg testified he owned the Medical Arts Prescription Shop, 4800 East 24th Street, Kansas City, Missouri, and made an inventory check of narcotics and value thereof which were taken from the shop on April 5, 1966, and he identified State's Exhibit 1 from cost stamps placed on bottles containing narcotics which were in his safe.

Melvin Lee Rogers, a pharmacist, was employed on April 5, 1966, by the Medical Arts Prescription Shop, having control of the store since 1964. At about four o'clock on the afternoon of April 5, as he was filling prescriptions, two persons, a colored female and a colored male, started to enter the store, the lady first. They appeared to change their minds; the gentleman pulled her away from the door and they walked in front of the store window, on down the street, and in about two minutes later they reappeared walking in the opposite direction. At approximately seven-thirty o'clock that evening, the same man entered the store while Rogers was on the telephone. Rogers recognized him and saw that he had a gun down to his side, carrying it in his right hand. The man came back to Rogers, jammed the gun into his side and said, "This is a holdup." As the man got up to Rogers, the same lady who had attempted to enter the store that afternoon entered with two other men. All four persons had weapons, and the lady walked up to Rogers and touched or punched him in his back with her gun. Rogers was taken to the rear of the store by the other man who there told him to get the money which was back there. The man finally decided it was not there so they went to the front of the store where the safe was located. They were all saying, "Shoot him, shoot him," and were shoving him toward the front. The other two men were attempting to open the cash register in front of the prescription department. Rogers opened the safe at the front of the store and as he did so the woman took off her coat, laid down her gun, and took the narcotics out of the safe (value $150.00 to $160.00) putting them into a box. She then put her coat back on and got her gun again. One man took Rogers by the arm to the cash register where the other two men were, and he was told to open the drawers which he did. Approximately $140.00 cash was taken. Both the narcotics and the money were in Rogers' personal possession, at least by his employment—his responsibility—at that time. Something was then said about making Rogers lie down, and as they were taking him to the rear of the shop one of the men struck him on the head, causing a wound which required surgical stitches. He fell, and the four were "hollering," "The cops are here," or "The police are there," and they were running by him out the back door. Rogers got up and ran out the front and down the side of the building, there colliding with one of the men and knocking him to the ground. Rogers then tackled him and got him down to the ground when a policeman had his gun and told the fellow to get up. Rogers told another policeman there was a lady in-

volved. They got a dog, went down the street and in about three minutes returned with the same woman who came into the store, whom Rogers identified at the trial as appellant, there being no doubt in his mind. The narcotics which were taken were strewn in the back alley, and Rogers identified them as being the property under his control, belonging to Eisberg. Appellant was carrying a chrome plated gun; the others were blue colored.

Anna June Gearhart had a little dry goods store located "cater-cornered" across from the Medical Arts Pharmacy on 24th Street, which she could observe from her window. At about four o'clock in the afternoon of April 5 she saw a lavender colored Cadillac drive down 24th Street a half block from her store and park. Four people, three men and a girl, all colored, got out of the car. One of the men had a pair of black leather gloves which he was putting on very meticulously. The four walked up to the corner where the Medical Arts Pharmacy was located, walked on down the street to an antique curio shop, looking up and down the street. Then the girl went on ahead to the Medical Arts Pharmacy, and the others followed "like ducks."

The girl stood there a few minutes, and two of the men took her and "practically drug" her down the street to the car. They got in it and left. Mrs. Gearhart's mother then called Rogers to be on the alert. Later that day, about six-thirty or six forty-five, Mrs. Gearhart saw the car again and called the police. She then saw the four persons inside the Medical Arts Pharmacy, three men and a girl, the same persons who were there earlier that afternoon. She saw one of the men raise his hand to strike Rogers, but did not see any weapon. One of the men brought Rogers to the front window where the safe was and while he was opening it the girl took off her coat and laid it on one of the chairs, then went to the safe and reached in. One man was with her and the other two were behind the prescription counter. Then she saw all four with

Rogers grouped at the prescription counter around the cash register. They escorted Rogers toward the back of the store and about that time the police came. Two policemen went in the front door and a third went down the side of the building, all with riot guns. Rogers also went down the side of the building and collided with one of the men. Mrs. Gearhart went across the street after the police had caught the persons, and saw three—two men and a girl. She had previously seen the girl come down apartment steps over the Medical Arts Pharmacy and run east on 24th Street. She saw her next when the police had her hand-cuffed and inside the police car. She was the same woman who attempted to go into the place of business at four o'clock that afternoon, who went into the place at seven-thirty o'clock, and who got into the safe inside the shop. There was no doubt in her mind but that appellant was the same woman and she pointed her out at trial. She also saw appellant in the lineup at police headquarters with two men.

Michael Steven Gwinn, a Kansas City police officer, was two blocks from the Medical Arts Pharmacy, in his car, and heard the call come over the radio that a robbery was in progress. He was first to the scene, and officers Faulconer and Brown followed within one minute. Gwinn observed one colored male stuffing coins into his hat behind the Medical Arts Pharmacy counter, and a colored female to his right looking on. He saw another colored male to the right of the female. One officer went to the rear of the store and Gwinn went in the front. The persons inside ran to the rear of the store and out the door. He saw the female run east. Two men were apprehended at the scene. Gwinn followed east in the back yards and he heard a rustling noise in the basement of one of the houses. He and officer Brown called into the basement, "If you don't come out, we are going to come in with the dog." A female voice came from downstairs, "I can't come out, I'm stuck." They went down with a dog which led them

to the suspect whom they found behind a furnace next to a wall. They pulled her out, and Gwinn, without any doubt in his mind, identified her as appellant. He found a silver snubnosed .38 calibre revolver in the alley along with narcotics, and some gloves stuffed with money.

Officer Hadley V. Hathcock identified appellant as the person the other two officers brought from the basement. Officer Brown testified that appellant was the woman whom he and Gwinn found in the basement wedged between the furnace boiler and the wall.

Officer Harold Kirchhoff conducted a special showup or lineup on April 6, 1966, concerning the robbery. Present were Mrs. Gearhart, appellant (the only woman in the lineup) and three males, all colored. Mrs. Gearhart identified appellant and Kirchhoff took a statement of identification from her. There were no other women in custody to place in the lineup with appellant, as was the normal custom. Appellant did not learn that only one woman was in the lineup until Kirchhoff took the stand after Mrs. Gearhart had identified appellant as being one of "a certain number of persons" referred to by the prosecution as being in the lineup. Appellant moved that the testimony of Kirchhoff (only) be stricken from the record on the ground that the showup was highly prejudicial to her with just one woman present, and moved that the jury be admonished to completely disregard it. The motion was overruled.

Appellant argues: "It would be hard to imagine a more flagrantly suggestive situation. What amounted to the exhibition of a single suspect to a witness for identification was, through the testimony of Anna June Gearhart, elevated to the status of unimpeachable evidence by being represented to the jury as an identification made by picking the defendant out of several colored women." Relied upon is the recent opinion of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, where the accused alone was exhibited to

a hospitalized witness (Mrs. Behrendt) from her hospital bed who identified him as her assailant and as the man who stabbed Dr. Paul Behrendt to death. She and the officers present testified at the trial to her identification of the petitioner in the hospital room and she also made an in-court identification of him. Petitioner claimed that the admission of Mrs. Behrendt's identification testimony violated his rights under the Fifth, Sixth and Fourteenth Amendments because he had been compelled to submit to the hospital room confrontation without the help of counsel and under circumstances which unfairly focused the witness' attention on him as the man believed by the police to be the guilty person. It was there held that the principle that counsel is required at pretrial confrontations of witnesses by the accused as being a "critical stage" of the proceedings (as held in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; and in Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178) was not retroactive because that application "'would seriously disrupt the administration of our criminal laws.'" 87 S.Ct. 1971 [8]. For that reason appellant does not here claim lack of counsel at the time of the lineup identification as being constitutional error, her trial being prior to the June 12, 1967 Stovall decision. She claims that the "conduct of the present lineup, or showup, was so flagrantly prejudicial as to be a denial of due process of law in violation of Article 1, Section 10 of the Missouri Constitution 1945, and the 14th Amendment to the Constitution of the United States." The same claim was made by petitioner in the Stovall case. It was said, 87 S.Ct. 1972, [10–12], "This is a recognized ground of attack upon a conviction independent of any right to counsel claim. Palmer v. Peyton, 359 F.2d 199 (C.A. 4th Cir. 1966). The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confronta-

tion depends on the totality of the circumstances surrounding it, and the record in the present case reveals that the showing of Stovall to Mrs. Behrendt in an immediate hospital confrontation was imperative." In United States v. Wade, supra, although the dangers in confrontation between the accused and the victim or witnesses to a crime to elicit identification evidence which might derogate from a fair trial were extensively discussed (87 S.Ct. 1933), a new trial was not granted Wade. Rather, the case was remanded to first give the Government "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." 87 S.Ct. 1939 [13, 14]. "On the record now before us we cannot make the determination whether the in-court identifications had an independent origin. * * * We therefore think the appropriate procedure to be followed is to vacate the conviction pending a hearing to determine whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error." 87 S.Ct. 1940 [16]. See also Gilbert v. State of California, supra, loc. cit. 87 S.Ct. 1956 [8–10].

■ The in-court identification of appellant by Mrs. Gearhart as being the woman who participated in the robbery clearly appears on this record not to be based upon the lineup identification alone. Although Mrs. Gearhart admitted that the first close-up look she had of appellant was when she was in the police car at the scene, she had the opportunity to and did, as she testified, observe appellant several times before the lineup was conducted: First, on 24th Street at four o'clock in the afternoon when appellant started to enter the pharmacy and apparently changed her mind; second when from the front of her store she could see three colored men and a colored girl inside the pharmacy, the same four persons she had seen earlier that day;

third, when appellant came down some stairs over the pharmacy and ran east on 24th Street; and, fourth, when the police had appellant handcuffed inside the police car. There was nothing done here by the officer conducting the lineup which would tend to suggest to the identifying witness that appellant was the guilty culprit in the minds of the police. Mrs. Gearhart's identification of appellant had an origin independent of the lineup identification. There was no violation of any constitutional right inherent in the identification. Besides, appellant was identified (independently of any lineup) as one of the robbers by the victim, Rogers; and by officers Gwinn, Hathcock and Brown as being at the scene, and cross-examination of them was had by appellant's counsel. Point II is overruled.

■ The information in accordance with the statute, § 560.120, RSMo 1959, V.A.M.S., is sufficient. It alleges that appellant, with others, with force and arms in and upon one Melvin L. Rogers unlawfully and feloniously did make an assault with a dangerous and deadly weapon, a revolver, taking goods and money of Joe Eisberg from Rogers against his will by force and violence by putting him in fear of immediate injury to his person. The verdict is responsive to the charge of first degree robbery. Appellant was informed of the verdict and allocution was granted. She was sentenced in accordance with the verdict and judgment was pronounced by the court. The sentence was within the permissible limits of § 560.135, RSMo 1959, V.A.M.S., for robbery by means of a dangerous and deadly weapon. Complied with are the matters specified in Supreme Court Rule 28.02, V.A.M.R.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.