**STATE of Missouri, Respondent,**

v.

**James Leonard COOMER, Appellant.**

**No. 54200.**

Supreme Court of Missouri,
Division No. 2.

Feb. 9, 1970.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Bell, Fullwood, Wilson & Harris, St. Louis, for appellant.

PRITCHARD, Commissioner.

Defendant was convicted by the verdict of a jury of stealing from a person. The information alleged two prior convictions and charged the instant offense. One of the prior convictions (robbery in the first degree) was admitted by appellant, through his counsel, in a proceeding prior to submission of the case to the jury and outside of its hearing, and the court found the previous felony conviction. Subsequently, after hearings on defendant's motion for new trial and on the matter of what sentence should be imposed, the court sentenced defendant to seven years imprisonment in the Department of Corrections.

The identification procedures used at the St. Louis Metropolitan Police Department of appellant by the victim of the alleged crime are challenged as being violative of defendant's rights under United States v.

Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; and Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402. It is contended also that the trial court should have instructed the jury on the lesser included offense of stealing under fifty dollars.

After midnight, March 16, 1968, Jack Abshire was returning to his home at 2519 Farrar Street in St. Louis, Missouri, from a neighborhood tavern. When he got about half way home he heard "two guys hollering." Upon looking around he did not recognize either of the men. He started walking fast but the two men ran and caught up with him at 2517 Farrar, next door to his home. They grabbed him and Abshire asked what they wanted and they said, "money." Abshire saw Mrs. Schachsieck, the woman next door, at her window. The men took Abshire by the arms and made him walk across the alley by a garage. "In the meantime this Emerson had throwed his coat over his left hand and said, 'I've got a gun', said, 'Don't try nothing.'" Abshire later learned that one of the men was named Emerson. The coat was a black weather coat which Emerson had on when Abshire was first accosted. The other man said, "Give me your money." Abshire reached into his "hind" pocket and gave him his billfold, and he took around $35.00 (a ten, three fives, and some ones), and gave back the billfold. They asked Abshire for his change which he gave them from his front pocket, also giving them his red Kisco Company (where he worked) identification badge. Coomer struck Abshire and kicked him in the chest, and Emerson shouted, "Leave him alone and come on," and they both ran down 25th Street.

The lighting in front of 2517 Farrar was by "modern and new" street lamps. It was two or three minutes from the time the two men grabbed Abshire until they ran up the street, and during this time, under the light, Abshire was able to get a good look at the faces of the two men and the clothing they had on. Coomer had on a short jacket and O.D. Army type pants. The other man had on the all-weather black coat. One was 5'–8" or 5'–9" and weighed about 170 pounds; the other weighed 150 or 160 pounds.

The police were called and Abshire gave them a description of the men. About 2:30 or 3:00 o'clock that morning Abshire, his wife and Mrs. Schachsieck went to the Fifth District Police Station and viewed two suspects. Abshire made an in-court identification of defendant as being one of the two men who took the money from him. He also identified a short blue jacket worn at the scene of the crime by defendant and also worn by him at the police station. The other man at the police station had on a black coat.

On cross-examination it was developed that the description Abshire gave to the police was of the clothing the two men were wearing, that they were white men, but he did not tell them anything about their faces or features, or that one of them was blond and the other had black hair. When he went to the District Station Abshire looked at just the two men—he did not pick them from a line-up.

When the police got to Abshire's house, they told him they had two suspects, two subjects, and wanted him to come down and identify them, which he did. He denied saying he was not sure when he first looked at them. He went into the room, looked at them, left and came back with Mrs. Schachsieck.

"Q. All right. So, sir, the truth of the matter is you could not give the police a description of the persons who allegedly took your money that night, is that right?

"A. Just the clothing.

"Q. Just the clothing? A. Yes.

"Q. You didn't know what the faces of the people looked like, is that right?

You didn't have any idea as to what their height was, isn't that right?

"A. I don't remember what I told them now.

"Q. Were you drunk? A. No, I was not.

"Q. You were not drunk?

"A. I was high, I was high, yes.

"Q. You were high. All right. But at that time you didn't give a description of this boy's face?

"A. Not of his face, no.

"Q. And you didn't give a description of his hair, isn't that true? A. Right.

"Q. And you couldn't give a description of the clothes that he had on other than he had on brown pants and a short jacket? A. Right.

"Q. So when you come in here today and tell this jury that you are able to identify this man, you are able to identify him here today because he is the person sitting here, isn't that correct?

(Objection overruled)

"Q. (Mr. Bell continuing) Isn't that true?

"A. Well, that's the guy that had the clothing on and I identified the clothing.

"Q. You identified the clothes?

"A. Yes.

"Q. But you couldn't identify the face?

"A. No.

"Q. So when you see him sitting before this Court here today and he's the only one sitting here, it's just as easy for you to say that is the guy, is that correct?

"A. Right."

On redirect examination Abshire testified:

"Q. (Mr. Walsh continuing) Now, so that we are clear, as you were standing there in front of the window and under the light, you saw the type of clothing that the men had on, is that correct? A. Right.

"Q. Did you also see their faces?

"A. Well, I seen their faces, yes.

"Q. All right. Did you see both of their faces?

"A. Yes.

"Q. How close were their faces to you?

"A. Not over a foot and a half.

"Q. All right. And how long a period elapsed while you were looking at their faces?

"A. Oh, it was about, I imagine two minutes.

"Q. And I'll ask you whether or not you saw the same faces when you went to the district that night?

"A. Yes.

"Q. And do you see one of those same faces in this court room? A. Yes.

*   *   *   *   *   *

"Q. (Mr. Walsh continuing) All right. If you see that same face in the court room would you point him out?

"A. Yes.

"Q. Will you do so?

(Witness indicates defendant.)"

On recross-examination Abshire admitted that he testified on cross-examination that he could not identify the face of the person, and further:

"Q. Well, now, when he asked you whether or not you could identify the person, you said, yes. Well, now, can you or can't you?

"A. Well, I don't think I'll ever forget them two faces.

"Q. Well, then, it is well imprinted in your mind, is that correct? A. Yes.

\* \* \* \* \* \*

"Q. (Mr. Bell continuing) Why didn't you tell them the description?

"A. I didn't tell them the details of the face.

"Q. Well, you were describing the face of an assailant?

"A. I'll never forget a face.

\* \* \* \* \* \*

"Q. Other than that you really couldn't identify anybody other than by the clothes?

"A. I could identify the face, that is in my mind.

"Q. In your mind? A. Yes."

Mrs. Nora Schachsieck, who lived at 2517 Farrar next door to Abshires, heard a commotion in front of her home about 12:20 a. m. on March 16, 1968. She looked out her front window and saw Abshire and two men. The lighting conditions in front of her home were bright: "The light is bright because it is a new one and it is as bright as day. That's the truth." She knocked on her window and the men ran. They were white men. One had on a blue jacket and had "kind of light hair." The other had on a black trench coat and had dark hair, and both were "around in their twenties." Mrs. Schachsieck called the police and told them what she had seen. A while later she saw the two men at the Fifth District police station, and in court she pointed out defendant as being one of the men she saw with Abshire. What Mrs. Schachsieck saw from her front window was developed on cross-examination:

"Q. So then you got about a three or four or maybe five second look at the people, is that right?

"A. Enough to look at them to see who they was.

"Q. About how long?

"A. Oh, I don't know, as long as they was there. It was a good while, though, it seemed like. They was trying to get into his pockets.

\* \* \* \* \* \*

"Q. Now, how long did you get a look at the men?

"A. Long enough to see who they was.

"Q. About how long was that?

"A. Well, it wasn't too long, but it was long enough, because it was so light out there. It was light as day."

The police came and told Mrs. Schachsieck that they had two suspects and wanted her to come down to the District Station. She did not pick the men from a line-up, but she identified them:

"Q. Now, is the clothes the main thing that you are able to identify better than anything else?

"A. No, I recognized them from their face.

"Q. Well, now, at the time you said it was light outside you were looking through the front window. Were you looking at the side of their face or were you looking at the front of their face?

"A. I was looking right at them.

"Q. Well, what part of their face were you looking at?

"A. Well, my heavens, they was looking right at me trying to get into the man's pocket. What else can I say?

"Q. I am asking you, Madam, whether or not you were looking at the side of their face or whether or not you were looking at the front of their face?

"A. I was looking at the front of them. How could I tell them then.

"Q. And was both of them facing you?

"A. Right to the front of my window.

"Q. Facing you, looking at you?

"A. I didn't say they was looking at me, but I was looking at them."

Detective Floyd Lindsay and Detective Bomerito arrested defendant. with another subject in the 3200 block of North Florissant, six or seven blocks from the place of the alleged crime. Defendant had on a dark short jacket and brown trousers. His companion had on a long black overcoat and dark trousers. He took defendant to the police station and within twenty minutes brought the Abshires there and into the same room in which defendant and the other man (Emerson) were. As he walked out of the room Lindsay heard something hit the floor that sounded like a piece of tin. He saw Detective Bomerito walk over toward defendant, and Bomerito showed Lindsay a Kisco badge.

As the Abshires were leaving the room after viewing defendant and Emerson, Detective Bomerito observed, from the corner of his eye, that defendant threw something to the floor and attempted to kick it under a closet door where he was sitting. Bomerito retrieved the object from the floor; it being a Kisco Company badge (State's Exhibit 3, identified by Abshire and testified to by him as being taken from him by his assailants).

At the trial appellant made no objection to, or motion to strike, the in-court testimony of identifications of defendant similarly as was done in United States v. Wade and Gilbert v. California, supra. He here argues that "There is a basic unfairness in a station house confrontation in which the victim at the station with the expectation of seeing his assailant, is shown only those who have been arrested in connection with this crime and asked for an identification. It is a situation made ripe for mistaken identification to the prejudice of the person held in confinement."

Defendant did not have counsel offered to him prior to the time that he was exhibited to the victim, Abshire, and the eye-witness, Mrs. Schachsieck. The question is whether the presence of counsel at the confrontation was "necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." Wade, supra, 87 S.Ct. 1932 [8].

Here the arresting officers took defendant into custody shortly after the alleged crime was committed, based upon the clothing and other description given them by Abshire and Mrs. Schachsieck. There is nothing in the record which tends to show that when the officers contacted the witnesses to view the persons in custody any suggestion was made that defendant and his companion were the guilty culprits other than their being suspects. See State v. Batchelor, Mo., 418 S.W.2d 929, 934 [3]. While Abshire was equivocal at one place in his cross-examination as to his ability to identify his assailants by their faces, yet all his other testimony was definite that he not only recognized them by their clothing but by their facial features. Any discrepancy between Abshire's direct and cross-examination testimony was for the jury to resolve on the issue of identity. Viewing his testimony alone, it is not conclusively demonstrated that his in-court identification of appellant was unconstitutionally tainted by the police station confrontation.

Mrs. Schachsieck's testimony positively shows that her in-court identification of defendant had an origin independent of the police station confrontation: She saw both men from her front window, under a bright light; and she was looking right at them for a sufficient length of time to see who they were. But aside from the testimony of identification of defendant given by these two witnesses, there is one other strong and compelling circumstance which

precludes the chance of misidentification: Abshire's Kisco Company red identification badge was taken from him at the time he was assaulted. That badge was observed by Detective Bomerito to have been dropped to the floor by defendant, after which he attempted to kick it out of sight under the closet door in the police station room. Defendant's possession of the victim's badge connects him to the crime, and is in addition to the record evidence before this court from which it may be determined that there was an identification source independent of the police station confrontation. See the Wade case, supra, loc. cit. 87 S.Ct. 1940 [16]. Under the total factual circumstances here, the Wade, Gilbert and Foster cases are not controlling.

Section 560.161 subd. 2(1), RSMo 1959, V.A.M.S., provides that the offense of intentional stealing defined in Subsection 2 of Section 560.156 is deemed a felony if the property intentionally stolen is taken from a dwelling house or a person, regardless of its value. The specific contention defendant here makes that he was entitled to an instruction to the jury on stealing less than $50.00 is ruled adversely to him under State v. Campbell, Mo., 386 S.W.2d 383, 384 [2, 3], where this statute was construed and the precise issue was involved.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

MORGAN, J., concurs.

DONNELLY, P. J., concurs in result.

FINCH, J., concurs in result in separate concurring opinion filed.

FINCH, Judge (concurring).

I concur in the result reached in the principal opinion. There was evidence of an origin or basis of the in-court identification independent of the confrontation at the precinct house, but I would not reach that question because, in my judgment, any asserted error in receiving identification testimony is not preserved for review.

The principal opinion points out that no objections were made at the trial to any in-court testimony by Mr. and Mrs. Abshire or Mrs. Schachsieck identifying defendant, nor were there any motions to strike such testimony. Instead, counsel for defendant examined the witnesses fully as to their identification and displayed familiarity with the confrontation which occurred, and defendant himself testified on the subject. This is in sharp contrast with what occurred in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, the cases which established the requirement for appointment of counsel in lineup cases. In those cases objections to the identification testimony were made. In the absence of such objections in this case, there was no error preserved for us to review unless the trial court was obligated *sua sponte* to raise the question at the trial. In my view, he was not.

In State v. Jackson, Mo., 448 S.W.2d 895, decided January 12, 1970, we considered the question of whether, in the absence of an objection or request, a trial court is required *sua sponte* to hold a Jackson v. Denno type hearing on the voluntariness of a confession. We held it was not, stating: "But when the evidence of the admission of guilt started coming into the case through the testimony of Officer Wilson, the trial court was not required on its own motion to call a halt to the trial and conduct a hearing outside the hearing of the jury on the voluntariness of appellant's confession." A large number of cases, both Federal and state, are cited in Jackson in support of the rule announced.

If the conclusion reached in that case is sound, as I think it is, it necessarily follows that the same reasoning would compel a decision that a trial court is not obligated sua sponte to raise an issue as to whether identification testimony might be excluded on the basis that counsel was not offered at a confrontation such as the one here involved. Paraphrasing language used in Garrison v. Patterson (C.A. 10th 1969), 405 F.2d 696, 697, wherein the court considered whether in that case the Jackson v. Denno procedure was required, I would say here: "The record reflects that there was no objection to the introduction before the jury of the [identification testimony concerning defendant at the scene and later at the precinct station] and that no circumstances existed to cause an awareness that counsel was questioning such admissibility on [the ground that counsel was not provided or the confrontation was unfair]. * * * Therefore, the issue of admissibility of the [identification testimony] before the jury was not present, and the [United States v. Wade procedure of holding a hearing outside the presence of the jury to determine admissibility] was not required."