UNITED STATES of America
v.
Patricio MENDOZA ACOSTA.
Crim. No. 1275–66.

United States District Court,
District of Columbia.
March 4, 1970.

---

Marshall Miller, Washington, D. C., for defendant.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

LEONARD P. WALSH, District Judge.

This matter came before the Court on remand by the Court of Appeals (No. 21,754, February 11, 1969, 133 U.S.App. D.C. 91, 408 F.2d 1294, Senior Judge Prettyman and Judges Danaher and Wright).

This case was tried to a jury by this Court December 14 through 22, 1967. Defendant was indicted for first degree murder and was found guilty by the jury of the lesser included offense of second degree murder of Leticia Salazar.

The remand order of the Court of Appeals directed the Trial Court to "conduct an evidentiary hearing, making findings to fact, and state his conclusions of law with respect to the following:

(1) Was the pretrial confrontation at La Plata, Maryland, on October 10, 1966, so unnecessarily suggestive and conducive to irreparably mistaken identification that the defendant was denied due process of law?

(2) Even should the foregoing question be answered in the negative, is there clear and convincing evidence that the in-court identifications had an independent source?

(3) Regardless of the answers to the above questions, assuming that the in-court identifications were tainted, taking into account the totality of the circumstances was the error in admitting them in evidence harmless beyond a reasonable doubt? (See No. 19,-846—Clemons v. United States, December 6, 1968, slip op. 6–8 [133 U.S. App.D.C. 27, 408 F.2d 1230])."

The evidentiary hearing was held on August 4 and 5, 1969, in accordance with the directions of the Court of Appeals, and the matter was taken under advisement pending preparation of the transcript and the filing of briefs by counsel. Counsel for defendant filed his brief on December 22, 1969. The Government has not submitted a brief. This Court now makes the following findings of fact and conclusions of law based on the evidence adduced at the hearing.

*Findings of Fact*

1. The decedent resided at 1465 Columbia Road, N. W., Apt. 41, with Minerva Reyes.

2. Both decedent and defendant were of Latin extraction, residing in the United States.

3. Charles Duckworth, who resided at 1479 Columbia Road, N.W., was 14 years old on October 9, 1966. On that date he was playing in the front of his residence with two younger boys. At approximately 3:45 P.M. he observed an individual walking west on Columbia Road at a rapid rate of speed, proceeding towards 15th Street, N.W. The individual attracted his attention in that he had no shirt on, and was bare from the waist up, and his arm was wrapped in a white shirt and the arm was bleeding.

4. Homicide officers, as well as other officers, on the scene made an investigation in the neighborhood and talked with Charles Duckworth, as well as Luis Viteri, aged 8, and Mark Proctor, aged 9, all of whom had observed the subject.

5. Subsequently, the statements made by the boys to the officers were reduced to writing, and the boys were notified that same evening they would be picked up and taken to La Plata, Maryland, the next morning.

6. The three boys were picked up by the police on the morning of October 10 and driven to La Plata to view a line-up.

7. The three boys rode on the back seat of the police car. Detective Antonio Ruiz rode with the driver on the front seat. There was no conversation with the boys as to who they were to identify; nor was there any suggestion by the police to the young men at the actual line-up.

8. Upon arrival at La Plata, the boys were taken to the court house and waited outside, and were then taken into a court room. Four men were brought in, comprising the line-up. The line-up consisted of three white men of "Anglo-Saxon appearance," none of whom had a mustache, as well as the defendant, who was wearing a shirt. No other Spanish appearing persons were available to participate in the line-up.

Charles Duckworth and Mark Proctor immediately identified the defendant as the man they had seen on the previous afternoon hurrying down Columbia Road, bare from the waist up, with his arm wrapped in a shirt and the arm bleeding. The youngest boy, Luis Viteri, aged 8, could not identify the defendant.

In the per curiam opinion reference is made to the fact that the three boys had seen a "Spanish" looking individual with a mustache, who had driven away in a blue Volkswagen station wagon. This Court takes notice of the fact that in the area of Fourteenth Street and Columbia Road, where the boys resided, a great many Latin Americans live and have businesses. The boys were accustomed to seeing Latin Americans, and defendant was not the only "Spanish looking" person they had seen. The identification of the defendant by the boys was not on the basis of his "Spanish look."

9. More than a year later, at the in-court identification in December, 1967, Charles Duckworth and Mark Proctor again readily identified the defendant as the man they had seen on October 9, 1966, hurrying down Columbia Road, without a shirt on, his arm wrapped in cloth and bleeding.

10. At the hearing in August, 1969, Charles Duckworth again readily identified defendant, and he again testified that he was able to make this identification on the basis of the face and hair. He stated that the man he had seen on October 9, 1966, was approximately 5 feet, seven, eight or nine inches tall. Actually defendant's measurements in court during the hearing showed him to be 5 feet, six and a half inches tall.

11. Further, there was testimony to the effect that a gathering was held at the home of Mrs. Francisca Marenco, 1763 Columbia Road, N.W., which defendant attended with his wife and

daughter, arriving early in the afternoon; that defendant left the party and returned wearing different clothing from that in which he was dressed in the early afternoon.

12. Shortly after the defendant's arrival, he left the party. He returned at approximately 7 P.M., wearing a dark suit.

13. The police went to La Plata on the night of October 9th, and in company with officers of the La Plata police force, went to the home of Mrs. Vischer who owned a farm and employed defendant. The officers examined a small blue car belonging to Mrs. Vischer, which she had loaned to defendant on October 9, 1966. The officers found blood on the floor of the car. The officers then went to the cottage where defendant resided, and defendant was placed under arrest and advised of his rights. He was taken to the La Plata police headquarters, where he was again advised of his rights and the charges which would be preferred against him, and that he would be returned to the District of Columbia. Defendant stated he would return without the formal extradition proceedings, but the Justice of the Peace advised that the necessary procedures would be taken care of by the Superior Court.

The per curiam opinion of the Court of Appeals mentions other "highlights developed at trial",—all of which pointed to defendant as the one who had committed the offense.

In addition to the three points having to do with the identification and which have been answered, there was overwhelming evidence of the defendant's guilt. For instance, there was testimony that his finger print was found on a cigarette package in the apartment of decedent; there was testimony from an expert witness as to the blood on the stair case leading from the apartment of decedent, which matched the blood of the defendant; there was blood on the seat and floor of the blue car loaned to him by Mrs. Vischer, and blood on the clothing of defendant which the officers found when they searched his home, all of which matched the Type B blood of defendant; a pruning knife was missing from the tool shed on the farm of Mrs. Vischer, and defendant had access to said building; a heel print with a design similar to the shoes worn by the defendant at the time of arrest was found at the scene; the defendant was wearing a gold medallion and chain at the time of his arrest similar to that seen by the young witnesses on Columbia Road; and photographs of the decedent were offered in evidence but the Court refused to admit them in evidence on the basis that the decedent was not only murdered but actually "butchered". Proof of defendant's guilt certainly could have been established without any of the testimony of the three boys, even though it would have depended upon circumstantial evidence.

### Conclusions of Law

██ 1. The pretrial confrontation at La Plata on October 10th was not "so unnecessarily suggestive and conducive to irreparably mistaken identification that the defendant was denied due process of law". The identification was made by each boy on the basis of his independent observations of the defendant on the previous day.

██ 2. At the in-court identification in December, 1967, the identification by Charles Duckworth was clear, and at the hearing on remand in August, 1969, his identification again was definite.

On both occasions a number of "Spanish looking" persons were present in the court room, including counsel. Charles Duckworth had no hesitation in identifying the defendant as the person whom he had seen on October 9, 1966. He was extensively cross-examined by counsel on both occasions. At no time did Charles Duckworth display any doubt about his identification of defendant. The Court concludes as matter of law that there was "clear and convincing evidence that

the in-court identifications had an independent source".

3. "Assuming that the in-court identifications were tainted, taking into account the totality of the circumstances" this Court finds the admission of the identifications were "harmless beyond a reasonable doubt" in view of the other evidence developed at the trial, which substantiated the identification of defendant as the person who had committed the offense.