487 P.2d 1281

**STATE of Utah, Plaintiff and Respondent,**

v.

**William Henry JORDAN, Jr., Defendant and Appellant.**

No. 12276.

Supreme Court of Utah.

Aug. 12, 1971.

John D. O'Connell, of Salt Lake Legal Defender Association, Salt Lake City, for appellant.

Vernon B. Romney, Atty. Gen., Lauren N. Beasley, Frank Nelson, Asst. Attys. Gen., Salt Lake City, for respondent.

HENRIOD, Justice.

Appeal from a murder conviction. Affirmed.

The evidence makes it appear that three young men collaborated in killing an elderly groceryman, subject of this appeal.

Appellant urges that: 1) It was error to deny defendant's motion to suppress identification evidence obtained at an unduly suggestive line-up, 2) that deception of a police officer that influenced a witness was reversible error, and 3) that the court erred in not granting a motion for a mistrial when an alleged co-murderer refused to be sworn.

We think 2) and 3) above are without merit, since the matters referred to were subjects for jury deliberation involving credibility, etc.

As to 1) : Two teen-age boys, eyewitnesses, made in-court identifications of defendant. One of them identified one of the alleged murderers at a line-up where two were present, but where there is nothing on the record to indicate that the defendant here was at such line-up. About two months after the murder the two teens positively identified defendant in a hallway at a preliminary hearing where they knew defendant was the defendant. The latter was handcuffed to another of the suspects, wore a T-shirt with "Salt Lake County Jail" stenciled thereon, at which time a deputy county attorney asked the teens if they could identify the suspects,—which they did. One of the witnesses said that beside seeing defendant at the scene, he recognized him on a TV broadcast shortly after the murder and arrest.

Defendants are led handcuffed from the jail to the courthouse for trial as a matter of course and necessity, and we know of no case reversing a conviction for that reason alone. We think neither the T-shirts nor the deputy county attorney's remarks lent any more suggestiveness of guilt or identity than the handcuffs, and are insufficient to change the result in affirming the trial court.

There being other and independent evidence by line-up of one of the defendants and showing pictures of one of them followed by an identification, and admissions by defendant himself, and other overwhelming evidence pointing to the participation of defendant in the holdup and murder as to convince us that any departure from standard, orthodox procedures anent identifications, in this particular case, was without any substantial prejudice to defendant, which if any existed, was dispelled by such independent identification factors and other evidence as not to violate any tenets of due process.

In this connection, the facts of this case are so different than those in Stovall v. Denno,[1] upon which defendant so heavily relies, as not to render that case dispositive here, save, perhaps, as an authority against the defendant's position, when it says that a "claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstance surrounding it,"—and in this respect the case more nearly supports the State's position than it does the defendant's.

The jury's verdict and the judgment entered thereon are affirmed.

TUCKETT, J., concurs.

1. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

CROCKETT, J., concurs and also concurs in the concurring opinion of ELLETT, J.

ELLETT, Justice (concurring in the result):

I concur in the result, but desire to elaborate thereon:

The defendant—hereafter referred to as Jordan—and several other dope-using hippies lived in an apartment and augmented their relief checks by stealing and burglarizing. They planned to rob an elderly merchant out in a residential area, and in the course of the robbery the merchant was shot and killed. The principal question involved seems to be "who pulled the trigger?"

Jordan contends that it was Johnny Knight who did it and claims that he himself was not in on the crime at all. His contention is bolstered by the contents of two letters written by Knight to some girl friends who were not writing to him while he was in jail charged with grand larceny. Knight was never charged with this murder, but since he stayed at the "pad" with the others and was one of them, he wrote the following:

About Weasmann's [the victim], we did it, I really don't know why! I'm sorry he got killed but he tried to grab the gun!

In another letter he wrote:

In fact I really thought at the time I was out that we were good friends but I guess since I turned murderer you changed your association huh?

Knight was called as a witness by the appellant and denied any participation in the robbery. He explained the language contained in the letters as being an attempt to impress his girl friends. He further testified that he had been out thieving the night before and got to bed early the morning of the robbery and slept until Jordan and his two companions returned to the apartment. On cross-examination he testified as follows:

Well, he [Jordan] said that he gave the guy a dollar and the guy turned around to give him some cigarettes and when he turned back around he had the gun on him and the guy came around the counter and grabbed and he shot and the guy jerked and, "I shot a couple more times and ran."

Knight was not an accomplice. Either it was he who killed the merchant or it was Jordan. There is no evidence that either one aided the other. The jury believed it was Jordan.

The evidence against Jordan seems overwhelming, and the jury could hardly have failed to believe the following: Jordan, Murphy, and a 17-year-old boy named Wilde planned the robbery. Wilde owned a

green Rambler car and was told by Jordan to follow Murphy and Jordan, who rode in a car which Jordan had stolen the night before. Wilde was told where to park his car. Jordan and Murphy drove nearer to the store. Murphy waited in the car while Jordan went in to commit the robbery. When Jordan came out, he and Murphy drove away in the stolen car and stopped it about one half block from the green Rambler in which Wilde was waiting. Jordan and Murphy ran from the stolen car to the Rambler, and all three sped away.

Two 16-year-old boys on the sidewalk between the Rambler and the stolen car witnessed the sudden stopping of the stolen car, the foot race of the two men as they ran within a few feet of the boys, the hurried entrance into the green Rambler, and the speedy departure. These boys paid particular attention to the running men and gave such a description of the men and the car that all three men were arrested and charged with murder.

One of the boys saw Jordan on television a few days after the crime and instantly recognized him as one of the two men who had run past him. He also saw Jordan at a preliminary hearing; and although a number of people were dressed as was Jordan, he nevertheless was able to identify Jordan as one of the running men.

The other lad did not observe Jordan in the courtroom at the preliminary hearing, but afterwards he was in the hall when Jordan and Murphy were led away and recognized them as being the ones he saw running to the green Rambler. There was no staging of a setup to influence the witness. He merely saw the men and recognized them.

Now, a man with long hair can readily change his appearance by changing his hair style, shaving, etc. Some pictures were shown the witness at trial, and he instantly identified those of Jordan and Murphy as being the men who ran by him to the green Rambler. He testified that there was no doubt in his mind about it.

I fail to see anything amiss in the identification made by these two witnesses. There was never any improper attempt to have these boys identify anybody. In fact, Jordan was never placed in a line-up for the witnesses to see.

The trial judge is the one who should determine whether testimony is competent, and the jury—not some Supreme Court—is the body which weighs the testimony and determines what the facts are. For us to interfere with this prerogative of the jury is to overturn the law as it has existed for five hundred years.

The dissenting opinion cites and relies on some federal cases which seem to overturn the established law as it relates to the functions of the jury, but already those courts are showing signs of repentance, and if state courts refuse to add their approval to the erroneous holdings, it may

**244**

be that the federal courts will rule so that a lawyer can find the law by consulting a law book instead of suddenly finding out what it is by reading a newspaper.

In addition to what has been said above, there was other evidence which justified the jury in finding Jordan guilty. He had a girl friend, aged 15, whom he told a few hours after the crime that he had just killed a man, and the next day he told her the details of how it came about. She testified as follows:

Q  Just tell us what he told you.

A  He said, "I went in the store to buy a pie and went up to the counter and gave the guy the money and told him to give me the rest of the money," and he gave him the change and the guy wouldn't do it and he started coming around the counter and Willie [Jordan] shot him and he kept coming after him and he shot him again and ran.

Jordan's attorney tried to counteract this positive testimony by leading the witness on cross-examination and elicited testimony as follows:

Q  Now, I have talked to you a number of times over the past few months haven't I?

A  Yes.

Q  Did you tell me about this?

A  No, I didn't.

Q  Now, you were in the car the night of December 5th or morning of Decem-

ber 6th when Willie was arrested weren't you?

A  Yes.

Q  That was a frightening experience, wasn't it?

A  Yes.

Q  And the police took you aside after that and talked to you then didn't they?

A  Yes.

Q  You don't remember what you told them do you?

A  No.

Q  Now, since then the police have talked to you a number of times, haven't they?

A  Yes.

Q  And they have told you that that night after Willie was arrested that you had said that Willie done it or Willie had told you?  Is my question clear?

A  No.

Q  Let me try it again.  When the police had been talking to you over the past several months they have told you that you had told them that Willie said he had done it?

A  I don't remember.

Q  Well, didn't they tell you that?

A  Yes.

The police officer denied having any such conversation with the girl, and the jury

was entitled to determine what the facts were. Even if what Jordan's lawyer was trying to get the girl to say were the truth, it is of no consequence since she never did change her testimony about what Jordan had actually told her. In fact, on further examination she testified:

Q What did you say when Willie said he had shot a man?

A I didn't believe him at first until he went into detail and told me what happened.

The girl testified that she had told two of her friends what Jordan had said, and then the prosecuting attorney elicited the following additional testimony from her:

Q And you have never told me this, have you?

A No.

Q Now, can you tell us why you didn't tell anybody before this?

A I was scared and I was trying to protect Willie.

The State gave further proof of Jordan's guilt by calling Wilde, the 17-year-old boy who owned the green Rambler. Wilde testified that he was told by Jordan where to park, that Jordan and Murphy rode in the stolen car and later ran from it to his car; that he was told by Jordan to drive back to the apartment; and that Jordan had a small pistol while in the car. He further testified that when they got to the apartment, Jordan said he was going to get some cigarettes, and when Wesemann (the victim) was to give him the cigarettes, he pulled a gun and told Wesemann it was a stickup; that Wesemann would not give the money and was reaching for him; and that he shot Wesemann twice and then ran to Murphy's car and drove to the Rambler. This witness was given immunity so that he could testify against Murphy and Jordan. He was an accomplice, but his testimony was amply corroborated by other competent evidence as outlined above.

Jordan makes no complaint about any of the instructions given by the court, and they seem to cover the question of corroboration properly.

Jordan makes one further claim of error. Murphy had previously been tried, convicted, and sentenced for the crime for which Jordan was on trial. The prosecuting attorney called Murphy as a witness, but Murphy refused to be sworn.[1] Jordan claims that Murphy's attorney told the prosecuting attorney that Murphy would not testify, and he claims that it was prejudicial error to call the witness.

There is nothing to this contention. Murphy had already been tried and had testified in his own behalf. Even if he had a privilege he did not claim it, he simply refused to be sworn. He and Jordan were

---

1. Until a witness is sworn he is not permitted to testify.

buddies, and he undoubtedly did not want to tell the truth. Neither did he want to have another felony conviction, to wit, for perjury, and so he refused to be sworn, knowing that a jail sentence was all he could get for contempt of court; and 30 days in jail might be preferable to his stay in the state prison.

I do not think there was any prejudicial error committed by the court during the trial of this case. The question of guilt or innocence was for the jury, and it seems to me that the verdict rendered was amply supported by the evidence. I would, therefore, affirm the judgment.

CALLISTER, Chief Justice (dissenting):

I respectfully dissent.

On December 4, 1969, Alfred Wesemann was shot and killed while resisting an attempted robbery of his grocery store. According to evidence adduced at the trial, three men participated in the commission of this crime, one, the gunman, went into the store; the second, Eugene Murphy, remained in a white Chevrolet outside of the grocery store; the third, Earl Wilde, waited in a green Rambler, a short distance from the scene of the crime. The primary issue of the trial was the identity of the person who shot Mr. Wesemann; the prosecutor asserted defendant was the man, and defendant contended that it was Johnnie Knight, aka Johnnie Hancock.

On appeal, defendant urges that the trial court erred in its denial of a motion to suppress the identification of two eyewitnesses on the ground that the pretrial confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.

The witnesses were two 16-year-old boys, Kirt Kueffner and Ray Wyllie; both made in-court identifications of defendant at his trial. The boys testified that they were walking along Lucy Street in Salt Lake City, when they observed two men get out of a white Chevrolet and run down the middle of the street for a distance of 100 to 150 feet, turn the corner and drive off in a green Rambler. The witnesses stated that the runners passed within five or ten feet of them and that they had an opportunity to observe them for about one minute. The boys testified that Eugene Murphy and defendant were the men whom they observed on Lucy Avenue.

Shortly after this incident, the witnesses attended a line-up, wherein Kueffner identified Murphy. Wyllie was unable to identify Murphy; Wyllie testified that the line-up was conducted too rapidly, and they were all dressed alike and had the same color hair. There was no evidence that Jordan participated in a line-up.

On January 28, 1970, almost two months after the Lucy Street incident, the two wit-

nesses positively identified Murphy and Jordan. Ray Wyllie explained that he went to the hallway outside of the courtroom where the preliminary hearing was being conducted. He knew that Murphy and Jordan were charged with homicide and that their preliminary hearing was being held in the courtroom. Neither boy was called to testify at the hearing. Wyllie stated that he didn't see them in the courtroom but that he knew they were in there. Wyllie observed Jordan and Murphy being brought back and forth between the jail and the courtroom. The two prisoners were handcuffed together and were wearing T-shirts with "Salt Lake County Jail" stenciled across them; they walked directly past the witnesses in the hallway. A deputy county attorney then queried whether the witnesses could identify them; they responded affirmatively.

Witness Kueffner testified that in addition to his observation of Jordan and Murphy on Lucy Avenue, he recognized them on a television news broadcast at the time they were arrested for Wesemann's death, at the time of the preliminary hearing from the back of the courtroom and out in the hallway. The witness testified that he and Wyllie were informed by the

police that they were the only eyewitnesses who could make an identification; the boys were eager to help solve the case and to be good citizens, who cooperated with the police. Kueffner further testified that subsequent to the hallway identification he went to the District Attorney's office twice or thrice where he observed pictures of Murphy and Jordan with their names affixed thereupon. Kueffner testified that he first talked with the police in the afternoon or evening of the murder.

The defense introduced a police bulletin that was issued at 11:05 P.M. (Mr. Wesemann died at approximately 2:50 P.M.) wherein the suspects were described. There was a fairly complete description of the driver of the green Rambler and of a person resembling Murphy. The third suspect was identified as eighteen years old, black hair, and no further description.

Defendant has not challenged the pretrial confrontation on the ground of a denial of the right of counsel at a critical stage of the proceedings.[1] He asserts the independent ground that his identification confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process of law.[2]

1. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

2. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

In Stovall v. Denno[3] the court stated that the practice of showing suspects singly for the purpose of identification, rather than in a line-up, had been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. In Foster v. California[4] the court emphasized the suggestive elements in the identification procedure which made it all but inevitable that the witness would identify defendant, whether or not he was in fact "the man." The court concluded that this procedure so undermined the reliability of the eyewitness identification as to violate due process.

In Simmons v. United States[5] the court framed the issue in terms of whether the pretrial identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. The court proffered certain standards in an evaluation of the totality of the circumstances of the identification procedure. First, was there justification for the procedure, the necessity for using the type of identification employed, the urgent character of the circumstances? Second, under the circumstances, was there a chance that the procedure utilized would lead to a misidentification? The court mentioned factors, such as the opportunity and length of time that the witness had to observe the accused, the period of time that elapsed from the occurrence until the time of identification, i. e., were their memories still fresh? In Simmons, a photographic identification procedure was being challenged, and the court mentioned the number of photographs displayed to the witnesses. In concluding its analysis, the court stated:

* * * Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any way suggested which persons in the pictures were under suspicion.

In Coleman v. Alabama[6] the court observed that the evidence adduced at the suppression hearing indicated that Reynold's (the witness) identifications were entirely based upon observations at the time of the assault and were not at all induced by the conduct of the line-up, which was allegedly impermissibly suggestive.

In the instant action, the trial court erred when it denied defendant's motion to sup-

3. Note 2, supra, at 388 U.S. 302, 87 S.Ct. 1967.

4. Note 2, supra, 394 U.S. 443, 89 S.Ct. 1127.

5. Note 2, supra, 390 U.S. 378, 88 S.Ct. 967.

6. Note 2, supra, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 394.

press the identification testimony of the two witnesses. There was no justification for the identification procedure utilized under the circumstances. There was a lapse of almost two months from the time of the initial observation until the identification, although Jordan had been in custody since two days after the incident. The evidence disclosed that Johnnie Knight was also in custody. Kueffner had previously identified Murphy, and Jordan was handcuffed to Murphy, and both were dressed in prison garb. The witnesses, who were in the hallway together, were informed that the prisoners were attending their preliminary hearing for the homicide of Mr. Wesemann.

The suggestive elements in the identification procedure made it all but inevitable that the witnesses would identify Jordan, whether or not he was in fact "the man." There was insufficient evidence adduced to indicate that the identification at trial was based upon independent observations and was not induced by the impermissibly suggestive pretrial confrontation.

Conceding that this identification testimony was inadmissible, this court, in my opinion, erred in resolving that the admission was harmless beyond a reasonable doubt, in view of the other evidence developed at the trial, which substantiated the identification of Jordan as the person who committed the offense.[7]

Defense counsel conducted a vigorous cross-examination of Kueffner and Wyllie; their credibility was clearly put in issue before the jury. Earl Wilde, the driver of the green Rambler, who was granted immunity from prosecution by the State, testified that Jordan was a participant in the crime. Johnnie Knight testified that Jordan re-enacted the crime as it happened to him later the same day. The defense produced letters written by Knight to two of his girl friends, which indicated that Knight was the gunman. Debbie Starr, defendant's 14-year-old girl friend, who was under psychiatric care, testified that Jordan told her that he had just killed a man. The prosecution produced evidence that at the time Jordan was confessing to his girl friend, he was in another section of the town stealing an automobile. Members and friends of the Starr family gave testimony that substantiated Jordan's story that he spent the afternoon of the murder in Granger, Utah, during a time period when he was supposed to be in a northside apartment plotting the robbery. Jordan had the murder weapon in his possession at the time of his arrest; he testified that Knight had given it to him.

The foregoing indicates the sharply conflicting nature of the evidence. The sig-

---

7. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. Mendoza Acosta, USDCDC, 309 F.Supp. 1382, 1383 (1970).

nificance and weight of the testimony of Kueffner and Wyllie on the jury cannot be accurately evaluated. I am compelled to conclude that in an evaluation of the totality of the circumstances, the identification procedure was so unduly prejudicial as to taint fatally Jordan's conviction.

The judgment of the District Court should be reversed, and this cause should be remanded with an order for a new trial.