## FOSTER *v.* CALIFORNIA.

No. 47.  Argued November 19, 1968.—Decided April 1, 1969.

*Kenneth L. Maddy,* by appointment of the Court, 391 U. S. 902, argued the cause and filed briefs for petitioner.

*Doris H. Maier,* Assistant Attorney General of California, argued the cause for respondent.  With her on the brief were *Thomas C. Lynch,* Attorney General, and *Charles P. Just,* Deputy Attorney General.

MR. JUSTICE FORTAS delivered the opinion of the Court.

Petitioner was charged by information with the armed robbery of a Western Union office in violation of California Penal Code § 211a. The day after the robbery one of the robbers, Clay, surrendered to the police and implicated Foster and Grice. Allegedly, Foster and Clay had entered the office while Grice waited in a car. Foster and Grice were tried together. Grice was acquitted. Foster was convicted. The California District Court of Appeal affirmed the conviction; the State Supreme Court denied review. We granted certiorari, limited to the question whether the conduct of the police lineup resulted in a violation of petitioner's constitutional rights. 390 U. S. 994 (1968).

Except for the robbers themselves, the only witness to the crime was Joseph David, the late-night manager of the Western Union office. After Foster had been arrested, David was called to the police station to view a lineup. There were three men in the lineup. One was petitioner. He is a tall man—close to six feet in height. The other two men were short—five feet, five or six inches. Petitioner wore a leather jacket which David said was similar to the one he had seen underneath the coveralls worn by the robber. After seeing this lineup, David could not positively identify petitioner as the robber. He "thought" he was the man, but he was not sure. David then asked to speak to petitioner, and petitioner was brought into an office and sat across from David at a table. Except for prosecuting officials there was no one else in the room. Even after this one-to-one confrontation David still was uncertain whether petitioner was one of the robbers: "truthfully—I was not sure," he testified at trial. A week or 10 days later, the police arranged for David to view a second lineup. There were five men in that lineup. Petitioner was the only person in the second lineup who had

appeared in the first lineup. This time David was "convinced" petitioner was the man.

At trial, David testified to his identification of petitioner in the lineups, as summarized above. He also repeated his identification of petitioner in the courtroom. The only other evidence against petitioner which concerned the particular robbery with which he was charged was the testimony of the alleged accomplice Clay.[1]

In *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v. *California,* 388 U. S. 263 (1967), this Court held that because of the possibility of unfairness to the accused in the way a lineup is conducted, a lineup is a "critical stage" in the prosecution, at which the accused must be given the opportunity to be represented by counsel. That holding does not, however, apply to petitioner's case, for the lineups in which he appeared occurred before June 12, 1967. *Stovall* v. *Denno,* 388 U. S. 293 (1967). But in declaring the rule of *Wade* and *Gilbert* to be applicable only to lineups conducted after those cases were decided, we recognized that, judged by the "totality of the circumstances," the conduct of identification procedures may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law. *Id.,* at 302. See *Simmons* v. *United States,* 390 U. S. 377, 383 (1968); cf. P. Wall, Eye-Witness Identification in Criminal Cases; J. Frank & B. Frank, Not Guilty; 3 J. Wigmore, Evidence § 786a (3d ed. 1940); 4, *id.,* § 1130.

Judged by that standard, this case presents a compelling example of unfair lineup procedures.[2] In the

---

[1] California law requires that an accomplice's testimony be corroborated. California Penal Code § 1111. There was also evidence that Foster had been convicted for a similar robbery committed six years before.

[2] The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury. But it is the teaching of *Wade, Gilbert,* and

first lineup arranged by the police, petitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber. See *United States* v. *Wade, supra,* at 233. When this did not lead to positive identification, the police permitted a one-to-one confrontation between petitioner and the witness. This Court pointed out in *Stovall* that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." 388 U. S., at 302. Even after this the witness' identification of petitioner was tentative. So some days later another lineup was arranged. Petitioner was the only person in this lineup who had also participated in the first lineup. See Wall, *supra,* at 64. This finally produced a definite identification.

The suggestive elements in this identification procedure made it all but inevitable that David would identify petitioner whether or not he was in fact "the man." In effect, the police repeatedly said to the witness, *"This is the man."* See *Biggers* v. *Tennessee,* 390 U. S. 404, 407 (dissenting opinion). This procedure so undermined the reliability of the eyewitness identification as to violate due process.

In a decision handed down since the Supreme Court of California declined to consider petitioner's case, it reversed a conviction because of the unfair makeup of a lineup. In that case, the California court said: "[W]e do no more than recognize . . . that unfairly constituted lineups have in the past too often brought about the conviction of the innocent." *People* v. *Caruso,* 68 Cal. 2d 183, 188, 436 P. 2d 336, 340 (1968). In the present case the pretrial confrontations clearly were so arranged as to make the resulting identifications virtually inevitable.

---

*Stovall, supra,* that in some cases the procedures leading to an eyewitness identification may be so defective as to make the identification constitutionally inadmissible as a matter of law.

The respondent invites us to hold that any error was harmless under *Chapman* v. *California,* 386 U. S. 18 (1967). We decline to rule upon this question in the first instance. Accordingly, the judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE WHITE, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART concur, being unwilling in this case to disagree with the jury on the weight of the evidence, would affirm the judgment.

MR. JUSTICE BLACK, dissenting.

The Court here directs the California courts to set aside petitioner Foster's conviction for armed robbery of the Western Union Telegraph Co. at Fresno, California. The night manager of the telegraph company testified before the court and jury that two men came into the office just after midnight, January 25, 1966, wrote a note telling him it was a holdup, put it under his face, and demanded money, flashed guns, took $531 and fled. The night manager identified Foster in the courtroom as one of the men, and he also related his identification of Foster in a lineup a week or so after the crime. The manager's evidence, which no witness disputed, was corroborated by the testimony of a man named Clay, who was Foster's accomplice in the robbery and who testified for the State. The testimony of these two eyewitnesses was also corroborated by proof that Foster and another person had committed a prior armed robbery of a Western Union office in another city six years before, when they appeared at the company's office, presented a note to an employee announcing their holdup, flashed a gun, and fled with company money. In this case Foster's attorney admitted con-

viction for the prior Western Union armed robbery.[1]
The circumstances of the two robberies appear to have
been practically indistinguishable. Such evidence that
a particular person committed a prior crime has been
almost universally accepted as relevant and admissible
to prove that the same person was responsible for a later
crime of the same nature.[2] A narration of these facts,
falling from the lips of eyewitnesses, and not denied by
other eyewitnesses, would be enough, I am convinced,
to persuade nearly all lawyers and judges, unhesitatingly
to say, "There was clearly enough evidence of guilt here
for a jury to convict the defendant since, according to
practice, and indeed constitutional command, the weight
of evidence is for a jury, and not for judges." Never-
theless the Court in this case looks behind the evidence
given by witnesses on the stand and decides that
because of the circumstances under which one witness
first identified the defendant as the criminal, the United
States Constitution requires that the conviction be
reversed. The Court, however, fails to spell out exactly
what should happen to this defendant if there must be a
retrial, and thus avoids the apparently distasteful task of
specifying whether (1) at the new trial the jury would
again be permitted to hear the eyewitness' testimony and
the in-court identification, so long as he does not refer to
the previous lineups, or (2) the eyewitness' "tainted"
identification testimony must be entirely excluded, thus
compelling Foster's acquittal. Objection to this ambi-
guity is the first of my reasons for dissent.

---

[1] Counsel also admitted a prior felony conviction of assault with
intent to commit rape, a circumstance relevant in California in
connection with punishment.

[2] See *Spencer* v. *Texas*, 385 U. S. 554, 560–561 and n. 7 (1967);
*State* v. *Chance*, 92 Ariz. 351, 377 P. 2d 197 (1962); *Nester* v.
*State*, 75 Nev. 41, 334 P. 2d 524 (1959); *Mosley* v. *State*, 211 Ga.
611, 87 S. E. 2d 314 (1955); 2 J. Wigmore, Evidence § 416 (3d ed.
1940 and 1964 Supp.).

## I.

The Court declares the judgment of conviction is reversed and the case remanded for further proceedings not inconsistent with this opinion. I am compelled to say that if I were the trial judge in this case I would not know how to proceed or how to decide whether the "error" in this case was harmless. Of course, when a confession is held to have been compelled, that confession must not be admitted to convict the defendant at all. But the situation in this case is not that simple. For the Court has in effect decided here that the officers of the law have so "arranged" lineups that the eyewitness to the robbery has been led to make an "irreparable mistaken identification." In other words, no one now or hereafter can believe his identification of Foster as the robber. Since he and the accomplice are the only eyewitnesses, and since, in order to convict, California law requires evidence of an accomplice to be corroborated, the Court's direction means, I suppose, that the trial judge here should dismiss the case.[3] The Court's dilemma, which leads to its ambiguous judgment as to the further disposition of this case, points, I think, to the irreparable harm done to the cause of justice by the Court's holding in this case.

## II.

Far more fundamental, however, is my objection to the Court's basic holding that evidence can be ruled constitutionally inadmissible whenever it results from identi-

---

[3] The Court apparently means that the only other evidence against Foster in this case—his prior conviction for involvement in a crime of a similar type—is constitutionally admissible. See *Spencer* v. *Texas, supra.* But it may be doubtful whether this past conviction, although highly relevant to the question of guilt, could constitute corroboration of the accomplice's testimony, within the meaning of the California requirement.

fication procedures that the Court considers to be " 'unnecessarily suggestive and conducive to irreparable mistaken identification.' " [4]  One of the proudest achievements of this country's Founders was that they had eternally guaranteed a trial by jury in criminal cases, at least until the Constitution they wrote had been amended in the manner they prescribed.  Only last year in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), this Court emphatically decided, over strong dissents, that this constitutional right to trial by jury in criminal cases is applicable to the States.  Of course it is an incontestable fact in our judicial history that the jury is the sole tribunal to weigh and determine facts.  That means that the jury must, if we keep faith with the Constitution, be allowed to hear eyewitnesses and decide for itself whether it can recognize the truth and whether they are telling the truth.  It means that the jury must be allowed to decide for itself whether the darkness of the night, the weakness of a witness' eyesight, or any other factor impaired the witness' ability to make an accurate identification.  To take that power away from the jury is to rob it of the responsibility to perform the precise functions the Founders most wanted it to perform.  And certainly a Constitution written to preserve this indispensable, unerodible core of our system for trying criminal cases would not have included, hidden among its provisions, a slumbering sleeper granting the judges license to destroy trial by jury in whole or in part.

This brings me to the constitutional theory relied upon by the Court to justify its invading the constitutional right of jury trial.  The Court here holds that:

> "[J]udged by the 'totality of the circumstances,' the conduct of identification procedures may be 'so

---

[4] *Ante*, at 442, quoting from *Stovall* v. *Denno*, 388 U. S. 293, 302 (1967).

unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law. . . .

"Judged by that standard, this case presents a compelling example of unfair lineup procedures." *Ante,* at 442.

I do not deny that the "totality of circumstances" can be considered to determine whether some specific constitutional prohibitions have been violated, such, for example, as the Fifth Amendment's command against compelling a witness to incriminate himself. Whether evidence has been compelled is, of course, a triable issue of fact. And the constitutional command not to compel a person to be a witness against himself, like other issues of fact, must be determined by a resolution of all facts and the "totality" of them offered in evidence. Consequently were the Court's legal formula posed for application in a coerced testimony case, I could agree to it. But it is not. Instead the Court looks to the "totality of circumstances" to show "unfair lineup procedures." This means "unfair" according to the Court's view of what is unfair. The Constitution, however, does not anywhere prohibit conduct deemed unfair by the courts. As we recently said in *United States* v. *Augenblick,* 393 U. S. 348, 352 (1969): "Rules of evidence are designed in the interests of fair trials. But unfairness in result is no sure measure of unconstitutionality."

The Constitution sets up its own standards of unfairness in criminal trials in the Fourth, Fifth, and Sixth Amendments, among other provisions of the Constitution. Many of these provisions relate to evidence and its use in criminal cases. The Constitution provides that the accused shall have the right to compulsory process for obtaining witnesses in his favor. It ordains that evidence shall not be obtained by compulsion of the accused. It ordains that the accused shall have the right to con-

front the witnesses against him. In these ways the Constitution itself dictates what evidence is to be excluded because it was improperly obtained or because it is not sufficiently reliable. But the Constitution does not give this Court any general authority to require exclusion of all evidence that this Court considers improperly obtained or that this Court considers insufficiently reliable. Hearsay evidence, for example, is in most instances rendered inadmissible by the Confrontation Clause, which reflects a judgment, made by the Framers of the Bill of Rights, that such evidence may be unreliable and cannot be put in proper perspective by cross-examination of the person repeating it in court. Nothing in this constitutional plan suggests that the Framers drew up the Bill of Rights merely in order to mention a few types of evidence "for illustration," while leaving this Court with full power to hold unconstitutional the use of any other evidence that the Justices of this Court might decide was not sufficiently reliable or was not sufficiently subject to exposure by cross-examination. On the contrary, as we have repeatedly held, the Constitution leaves to the States and to the people all these questions concerning the various advantages and disadvantages of admitting certain types of evidence. *Spencer* v. *Texas,* 385 U. S. 554 (1967); *Michelson* v. *United States,* 335 U. S. 469 (1948).

It has become fashionable to talk of the Court's power to hold governmental laws and practices unconstitutional whenever this Court believes them to be "unfair," contrary to basic standards of decency, implicit in ordered liberty, or offensive to "those canons of decency and fairness which express the notions of justice of English-speaking peoples . . . ." [5] All of these different general

---

[5] *Malinski* v. *New York,* 324 U. S. 401, 417 (opinion of Frankfurter, J.) (1945); see also *Rochin* v. *California,* 342 U. S. 165 (1952); *Irvine* v. *California,* 347 U. S. 128 (1954).

and indefinable words or phrases are the fruit of the same, what I consider to be poisonous, tree, namely, the doctrine that this Court has power to make its own ideas of fairness, decency, and so forth, enforceable as though they were constitutional precepts. When I consider the incontrovertible fact that our Constitution was written to limit and define the powers of the Federal Government as distinguished from the powers of States, and to divide those powers granted the United States among the separate Executive, Legislative, and Judicial branches, I cannot accept the premise that our Constitution grants any powers except those specifically written into it, or absolutely necessary and proper to carry out the powers expressly granted.

I realize that some argue that there is little difference between the two constitutional views expressed below:

> One. No law should be held unconstitutional unless its invalidation can be firmly planted on a specific constitutional provision plus the Necessary and Proper Clause.

> Two. All laws are unconstitutional that are unfair, shock the conscience of the Court, offend its sense of decency, or violate concepts implicit in ordered liberty.

The first of these two constitutional standards plainly tells judges they have no power to hold laws unconstitutional unless such laws are believed to violate the written Constitution. The second constitutional standard, based on the words "due process," not only does not require judges to follow the Constitution as written, but actually encourages judges to hold laws unconstitutional on the basis of their own conceptions of fairness and justice. This formula imposes no "restraint" on judges beyond requiring them to follow their own best judgment as to what is wise, just, and best under the circumstances of a particular case. This case well illustrates the extremes

to which the formula can take men who are both wise and good. Although due process requires that courts summon witnesses so that juries can determine the guilt or innocence of defendants, the Court, because of its sense of fairness, decides that due process deprives juries of a chance to hear witnesses who the Court holds could not or might not tell the truth.

I began my opposition to this fallacious concept of "due process" even before I became a member of this Court [6] and expressed it formally soon after my service on the Court began.[7] And it was not long before I emphasized that quite a different belief about the meaning of the phrase "due process" had long existed in our judicial history in opposition to the "decency and fairness" doctrine. See *Chambers* v. *Florida*, 309 U. S. 227, 235–236, n. 8 (1940).

My experience on the Court has confirmed my early belief that the "decency and fairness" due process test cannot stand consistently with our written Constitution.

### III.

I agree with the Court that we should not undertake to pass on the question of harmless error for the first time in this Court. Under the Court's holding, the case should be remanded to the state courts for decision of this question.

In recent years this Court has, in a series of cases, held that most of the Bill of Rights is now applicable against the States as well as against the Federal Government. This has brought about a tremendous increase in the number of state criminal cases involving federal questions, some of which depend on the particular facts and circumstances of the case. In Fifth Amendment

---

[6] See, *e. g.*, 81 Cong. Rec. App., pt. 9, pp. 638–639; *id.*, at 307.

[7] See, *e. g.*, *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419, 423 (1938) (dissenting opinion).

confession cases, for example, courts must under prevailing practice hear evidence to determine whether confessions were compelled. This Court has power in cases of that kind to review evidence before the trial courts. No one can now predict with accuracy how great a number of such cases are destined to come before us, but all know it will be many. Should we not make it an almost invariable practice to accept lower court findings of fact on such issues, our Supreme Court is likely to find itself preoccupied with the business of a state court of criminal appeals, a condition not devoutly to be wished in the Court's interest or in the interest of the administration of justice in general. This problem is magnified many times over when account is taken of the harmless-error rules that many States have now adopted, since these rules also raise factual issues involving a federal question whenever the error itself is federal. See *Chapman* v. *California,* 386 U. S. 18 (1967). If trial errors are found some courts along the line must determine whether the error was harmless. That question has, because of this Court's judgment, now arisen in this case. I agree with the Court that we should not decide this question here. In the present posture of criminal law, there are simply too many federal questions in the state cases before us to defend a practice of our deciding in the first instance that there was no harmless error. There are many reasons for this other than the necessity of saving our time for the vastly more important issues we must decide. To say the least, the question whether an error in a particular case is harmless is an issue peculiarly for lower, not for the highest, appellate courts. Then, too, this issue can usually be tried more efficiently, and just as fairly, by the local court that tried the case or by the local appellate court that heard the first appeal. This Court was not established to try such minor issues of fact for the first time. Of course, I do not mean to suggest that

there should be an ironclad rule always barring the Court from deciding an issue in cases if it plainly and manifestly appears that it would be egregiously unjust and undoubtedly wrong to leave an issue undecided. But I do not think this even distantly approaches being such a case. Even though I steadfastly believe the Court's basic holding is error, I do agree that we should not establish a precedent of passing on harmless error for the first time in this Court before the courts below have had an opportunity to consider the question.

For the above reasons I dissent from the reversal and remand of this case.