## JOSEPH SIMON, JR. *v.* STATE OF MARYLAND

[No. 369, September Term, 1968.]

*Decided August 8, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Stanley S. Cohen* for appellant.

*Thomas M. Downs, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *David R. Eaton, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant was convicted of sodomy and robbery with a deadly weapon by Judge Charles D. Harris, sitting without a jury, in the Criminal Court of Baltimore. He was sentenced to serve six years in each case, the sentences to run consecutively.

Barry Steeley, eighteen years of age, testified, that at approximately 4:00 a.m. on the morning of June 12, 1968, he was waiting for a bus on a street corner in Baltimore, having just arrived in the City from a vacation in Canada. A man, whom he positively identified in court as the appellant, approached and told him the bus stopped at the next corner. As the two of them walked toward the next intersection, the appellant pulled out a gun and said, "start walking." Steeley was forced, at gunpoint, to walk four blocks through deserted streets to a vacant, dilapidated building which they entered. After examining the contents of a paper bag being carried by Steeley which contained clean clothes, men's toilet articles, and some Canadian souvenirs, appellant ordered him to the second floor. There, according to Steeley: "He put the gun up to my chin, up to my neck, and he said, he was going to kill me. He said, 'I'm going to kill you. Do you know why?' I didn't respond, and he said, 'Because you're a white bastard and a white bastard killed Martin Luther King.' Then he instructed me to take off all my clothes and strip off my clothes. * * * After I stretched on the floor, he stated, 'Lay face down.' Then he performed this act, inserting his penis in my rectum. After that was over, he instructed me to get up and go in the corner where this

closet was. He searched my clothes and gave me back my clothes, piece by piece, and he came to my wallet and looked through it and took my cards out and kept the wallet and gave me back what he didn't want out of my clothes and wallet."

After ordering Steeley to leave the building, appellant disappeared. Steeley walked to the nearest police station, reported what had just occurred and gave a description of his assailant.

At a later date, Steeley was requested to come to the Central Police Station for the purpose of viewing a line-up. The evidence indicates that while Steeley was waiting in the lobby of the station talking to a police officer at one end of a room approximately fifty feet in length, occupied by "a lot of people," a police officer walked the appellant through the other end of the room and, without pausing or stopping, both the officer and the appellant entered a small anteroom. As this occurred, according to Steeley, "I jumped up and said, 'That's the man.'" Steeley stated that prior to this he had been shown his wallet which had been recovered from the appellant by the police but that nothing had been said to him about the appellant. The next day Steeley, again, identified the appellant at a preliminary hearing.

Appellant's trial counsel moved to strike out that part of Steeley's testimony in which he identified the appellant, asserting that it was tainted by the out-of-court identification. In support of this motion, the appellant took the stand for the sole purpose of testifying as to the circumstances surrounding his out-of-court identification. He testified, in part, as follows:

> "A. When I was arrested and taken to the police station, they put me in a cell, and I stayed in the cell. I stayed, I can't recall how long, I stayed in the cell, anyway. Then they brought me out, and an officer came back and asked if I knew a Barry Steeley. So, I told him, 'I didn't know him.' He said,

'You have his wallet.' So, I said, 'Well, I understand I have his wallet. I found the wallet.' So he said, 'But you don't know him?' I said, 'No, sir.' "

\* \* \*

"A. They brought me out of the front of Central, as I was standing out there, Mr. Steeley and one officer was standing up and talking.

Q. Where was that?

A. That was over in the middle of the floor. All the way over, they was all the way over by the window.

Q. What happened then?

A. So, they took me in the room. They asked me, they kept telling me, that I had this wallet and what-not, and kept telling me—

Q. Where was Mr. Steeley?

A. He was outside.

Q. When did he come into the room?

A. He didn't come into the room."

\* \* \*

"Q. You were at one end of the room, and he was at the other end?

A. Yes, sir.

Q. No one ever pointed their finger at you?

A. Yes, sir.

Q. Who pointed their finger at you?

A. He pointed his finger at me.

Q. When did he do that?

A. When I came in, when I came in. When the officer brought me out of the cell, he was standing over there with the officer. So, I heard the officer say, 'That's him.' He looked to me and nodded his head like that (indicating).

Q. He did this?

A. Yes, sir.

> Q. Was anybody standing between you and him, when he did that?
>
> A. Anyone standing? When him and the officer was on this side of me, I was on the other side, facing them. The officer was on the outside (indicating).
>
> Q. You were just marched through the room into the little room?
>
> A. Yes, sir.
>
> Q. And Steeley didn't come into the little room with you?
>
> A. No, sir."

The appellant contends that if the principles enunciated in *U. S. v. Wade,* 388 U. S. 218; *Gilbert v. California,* 388 U. S. 263; and *Stovall v. Denno,* 388 U. S. 293, are applied, "the circumstances present in the case at bar tainted the identification by the prosecuting witness and thereby rendered it inadequate, if not altogether invalid." We disagree.

It is true that in *Smith and Samuels v. State,* 6 Md. App. 59, this Court "held that the rules of *Wade* and *Gilbert* apply to pre-indictment, as well as to post-indictment lineups and to other police-initiated pretrial confrontations that are not subject to fair and meaningful review later at the trial." *Watson v. State,* 7 Md. App. 225. On the other hand, we held in *Tyler v. State,* 5 Md. App. 265, that the strictures of *Wade* and *Gilbert* are not applicable to preliminary hearings. Accordingly, we find no merit in the appellant's first contention that his lack of counsel at the preliminary hearing, tainted the in-court identification testimony given by Steeley.

With respect to the identification that took place in the lobby of the police building, it must be borne in mind that the mandates of *Wade* and *Gilbert* are directed toward "police-initiated pretrial confrontations." As we said in *Watson v. State, supra*: "It is readily evident that where the police, by pre-design, arrange a one-to-one confrontation between the victim and the accused in the po-

lice station, such a circumstance, of itself, would necessarily have a great bearing on the question of whether there has been a denial of the accused's Fourteenth Amendment right to due process." In the case at bar, however, there is no evidence to support the proposition that there was a pre-designed plan by the police to expose the appellant to the prosecuting witness. The mere act of walking the appellant through a crowded police station lobby without stopping or pausing does not, under the circumstances here present, amount to a "police-initiated pretrial confrontation" as envisioned by *Wade* and *Gilbert*. The trial judge carefully analyzed the factual circumstances under which the identification of the accused occurred and he concluded that "at the time the police brought the defendant into the room \* \* \* there is no evidence whatever, that the prosecuting witness had been forewarned that a suspect would be brought into the room. \* \* \* He was never asked at the time, if the defendant was the assailant but he voluntarily jumped up out of his chair when the defendant was brought in and said, 'He's the one.' \* \* \* Under all of the testimony, including that of the defendant, who took the stand for this issue alone, it would seem that the identification was wholly voluntary and in fact, spontaneous."

It is true that appellant testified that the police pointed him out to the prosecuting witness but this was denied by both the police and the prosecuting witness. And the trial judge, who was not required to believe the appellant, see *Melia and Shelhorse v. State,* 5 Md. App. 354, clearly took this into consideration for he stated: "I believe the testimony of Mr. Steeley, the prosecuting witness, and I do not believe the testimony of the defendant."

In the totality of the circumstances, we cannot say that the extra-judicial identification of appellant occurred under such conditions or in such an atmosphere as to make it so unreliable and unfair that it tainted the in-court identification to such an extent as to make it constitutionally inadmissible. See *Wilkins v. State,* 5 Md. App.

8; *Wethington v. State,* 7 Md. App. 79. Stated otherwise, the in-court identification of the appellant was not, in our opinion, the result of an impermissibly suggestive out-of-court confrontation. See *Foster v. California,* 394 U. S. 440.

Since the positive identification of an accused by the victim of a crime constitutes legally sufficient evidence to sustain the conviction, *Poff v. State,* 3 Md. App. 289, 292, the judgments of conviction must be affirmed.

*Judgments affirmed.*