JIMMIE L. MANNS v. STATE OF INDLANA.

[No. 172 S8.  Filed August 13, 1973.]

*Jack G. Willard,* of Gary, for appellant.

*Theodore L. Sendak,* Attorney General, *A. Frank Gleaves, III,* Deputy Attorney General, for appellee.

HUNTER, J.—This is a direct appeal from a conviction of rape and kidnapping. Defendant-appellant was charged by affidavit and a jury trial commenced on February 2, 1971. The jury returned a verdict of guilty and appellant was sentenced to the Indiana State Prison for not less than two nor more than twenty-one years for rape, and sentenced to life imprisonment for kidnapping. His belated motion to correct errors was denied on November 22, 1971.*

Although appellant addresses several arguments to the

---

* Transferred and re-assigned to this office June 28, 1973.

questions involved, there are but two issues presented for our review.

(1) Whether there is sufficient evidence to sustain the conviction of rape; and

(2) Whether the victim's in-court identification of the appellant was tainted by an improper pre-trial identification procedure.

At approximately 10:00 p.m. on March 25, 1970, the nineteen-year-old victim was driving home in a heavy snowstorm. She noticed a car following her as she turned into the alley behind her family's house. When she stopped her car, the other auto pulled up beside her and a man got out of the car. This man was subsequently identified at trial as the co-defendant, Thomas Williams. Williams apologized to the victim for following her and stated that he had mistaken her car for another belonging to his brother-in-law. He then returned to his automobile. The victim then parked her car in the garage, got out, and saw Williams standing at the garage door. He put a gun to her side and grabbed her arm. A second man appeared, who was later identified as the appellant, and the two men forced the girl into the back seat of their car. When they found that their own auto was stuck in the snow, the men put the girl into the back seat of her own car, threw a coat over her head, and drove away. After a drive of approximately twenty minutes, the men stopped the car. They allowed the victim to sit up while holding her at gun point. She testified as follows:

\* \* \*

Q. "What happened next, if anything?"

A. "Then they said that they were going to rape me."

Q. "And, what happened next, if anything?"

A. "Well, then they changed places. One that was in the back seat, climbed over the front, one in the front climbed over the back."

Q. "Now, do you recall which one came in back?"

A. "Williams."

Q. "What happened next?"

A. "Then he . . ."

Q. "Ok, uh, go ahead."

A. "Then he started to, to rape me."

Q. "Did he succeed?"

A. "He said he didn't know."

Q. "All right. And, what happened next, if anything?"

A. "Then they switched places, again, and they switched the gun back again. So the one in the front seat had the gun on me."

Q. "Did you, I'm sorry, Mr. Gray. What, if anything, happened next?"

A. "Well, they said if I, was, I tried to push them away, and he said that if I tried to . . ." (cut off)

Q. "Tried to push who away?"

A. "Well, first Williams, and then the second time Manns."

Q. "All right, what did they say?"

A. "They said that if I tried to resist them they would kill me."

Q. "What happened next?"

A. "Then Manns raped me."

Q. "Was Manns the second one?"

A. "Yes."

Q. "All right. Linda, now the question, did you feel Manns . . . Did you feel Manns?"

A. "Yes."

Q. "Did you feel him inside of you, Linda?"

A. "Yes."

Q. "All right. What happened next, if anything?"

A. "Then they switched places again and then Williams came in the back. And they switched the gun again."

Q. "Did you see them switch the gun?"

A. "Yes."

Q. "What happened next?"

A. "And then Williams raped me too."

After the sexual assaults were completed, the appellant and Williams returned the victim to the general vicinity of her

home, told her that if she reported the incident to the police she would be killed, and got out of the car. The elapsed time since the abduction was approximately one and one-half hours. The victim drove home, and upon arrival her parents called the police, then took her to the hopsital for treatment and examination by the family physician. The doctor testified that something had penetrated the vagina of the victim and had caused a tear of the hymen. The physician testified that this could have been caused by the insertion of a penis.

Appellant contends that the evidence of rape failed to establish penetration. He urges that the statement of the prosecuting witness, "Then Manns raped me," is a mere conclusion on the part of the witness since there is no showing of her understanding of the term "rape."

This court has previously answered a similar contention in *Davis* v. *State* (1972), 258 Ind. 533, 282 N. E. 2d 805. The record discloses that the victim in the instant case was nineteen years old, she testified as to the force used against her, and she stated that she felt the appellant inside her. In addition, there is the testimony of the family doctor that something penetrated the vagina, possibly a penis. This cumulative testimony is sufficient to support the finding that a rape had occurred. *Davis* v. *State, supra; Weaver* v. *State* (1963), 243 Ind. 560, 187 N. E. 2d 485.

The police investigation of the rape and kidnapping was commenced immediately after the incident. The appellant's coat was found in the victim's auto. It contained his wallet, checkbook, identification cards, and various other papers addressed to him or bearing his signature. After running a records check, the police took two photographs (one of each defendant) to the victim's home and asked her if these were the men who raped her. Both photographs were shown to the victim simultaneously, and she stated that they matched the description of the men who attacked her. One of the police officers testified as follows:

Q. "I see, now, uh, on what date was this, that you showed the complaining witness these pictures?"

A. "Friday, the 27th."

Q. "Friday, the 27th. Now, Officer, uh, how many pictures did you show to the complaining witness?"

A. "Two (2)."

Q. "And, uh, whose pictures were they?"

A. "Thomas Williams and Jimmie L. Manns."

Q. "Did you, uh, did you also tell her where you got the pictures from?"

A. "No, sir."

Q. "Uh, did she ask?"

A. "Yes, sir."

Q. "Uh, since March the 25th, 1970, have you had a course, or during the course of your study, uh, have you gained any additional information with regards to the submitting of photographs to complaining witnesses?"

A. "No, sir."

Q. "Uh, is it the general practice in police business, to submit to a complaining witness, one (1) picture or many pictures? And let them pick out which one?"

A. "I believe it's many pictures."

Q. "It's many pictures. All right. In fact, what number would you, as a police officer, feel was an adequate opportunity for the complaining witness to identify?"

A. "Six (6)."

Q. "Six (6), and, uh, the ratio then would be six (6) to one (1), is that right?"

A. "Yes, sir."

Q. "In this case, this was not done?"

A. "No, sir."

Contrary to the position taken by the officer, the prosecuting witness testified that the police did tell her how they came about the two photographs. She stated that it was because of the names that were on the paper and cards in the coat found in her car. Later, the witness was taken to a line-up at the

police department. She was again shown the two photos by the prosecuting attorney and then asked to pick out the men in the line-up who attacked her. She did not identify the appellant at this time. Appellant urges that this pre-trial identification was so impermissibly suggestive as to irreparably taint the in-court identification of the appellant.

We agree that the pre-trial identification of the appellant by use of the photographs was improper. It was completely divergent to the principles that this Court laid down in *Johnson* v. *State* (1972), 257 Ind. 634, 277 N. E. 2d 791. However, we are not prepared to concur with the appellant that the in-court identification did not have an independent basis, so as to constitute a proper identification. The victim testified that she could see both men when they pushed her into her car. She further testified that there was enough light to see both men when they stopped the car and raped her; she was with them for over an hour. She had opportunity to observe them on the drive back to the vicinity of her home, was looking at them when they threatened her life and departed from the car. When asked on cross-examination upon what basis she was identifying appellant and the co-defendant, she stated, because, "that's the way they looked on March 25th." Again, on re-direct examination:

Q. "Now. I ask you, Linda, uh, again, on what you base your identification, today, of the gentlemen who are named as Defendants, and who sit here innocent, who are charged with the crimes that you say were committed on you, on what do you base this identification?"

A. "By the way they look."

Q. "When?"

A. "On March 25th, and the way they look today."

In light of all the above evidence, we find that it is clear that the in-court identification of the appellant had an independent basis. Therefore, regardless of the impropriety of the pre-trial identification through the two photographs, it was not error for the trial court to allow the

the in-court identification.[1] Finding no error in the proceedings below, the judgment of the trial court is hereby affirmed.

Arterburn, C.J., Givan, Prentice, JJ. concur.

DeBruler, J., dissents with opinion.

## DISSENTING OPINION

DeBruler, J.—Although I agree with the majority that the pre-trial photographic display used by the police on the day after the incident was clearly impermissibly suggestive, I cannot concur in the Court's finding that there was no substantial likelihood that the victim's in-court identification was based on the series of suggestive pre-trial identification procedures rather than on her independent recollection of her attackers on the night of her abduction.

At the outset I believe the record of this case establishes facts which indicate the victim may have been impeded in her opportunity to observe her attackers on the night in question. While the victim's testimony does indicate that she was with her assailants for "over an hour" as the majority states, she also testified that for both the ride out to the rape scene and the ride back (a period of twenty to twenty-five minutes each way according to her testimony) she was forced to lie on the back seat of the car with a coat over her head. The entire incident took place at night in, what was described throughout the trial as, a very severe snow storm. The victim testified that she could not describe the clothing the men wore on that night because "it was dark".

It must also be pointed out that the display conducted on March 26, was suggestive in the extreme since in addition to only providing one picture of the co-defendants the police, however unintentionally, provided information to the victim

---

[1] See Neil v. Biggers (1972), 409 U.S. 188, 34 L. Ed. 2d 401, for a case decided under similar facts as the instant case where the in-court identification was upheld by the Supreme Court of the United States.

which could have influenced her identification and solidified her opinion as to the identity of her attackers. The victim testified that when the police came to her house on the day after the incident they told her they had two suspects and that they had pictures of the two which they wished her to identify. They also told her that they had been lead to these suspects from papers and identification cards found in her car on the previous night. We have only recently pointed out the inherent dangers of the police providing information to a witness which implies that they have suspects and they wish only to have their suspicions confirmed through a cooperative identification. *Sawyer* v. *State* (1973), 260 Ind. 597.

Moreover, it is also important to note that in addition to the March 26 photographic display there were several subsequent suggestive pre-trial identification situations. Shortly after her official identification the victim went to the prosecutor's office for an interview and the prosecutor took the mug shots from the folder and showed them to her. Later on the victim was asked to identify her attackers from a lineup and the prosecutor again showed the same two pictures to her several minutes before the lineup in order to assist her in her identification. In each of these displays the same and only two photographs were used as were provided to her at the March 26 display. There appears in this record, therefore, at least three incidents of highly suggestive identification procedures.

I believe it is also important to note that the victim's positiveness in her identification of appellant increased noticeably from shortly after the crime until her in-court identification at the trial. The victim testified that on the day after her attack she told the officer the picture of appellant "looks like the man" who attacked her. At the corporeal lineup held somewhat later she failed to pick out the appellant as one of her attackers but instead selected someone else. Thus the victim was able to identify appellant at trial (when he was sitting with a co-defendant and his attorney at the counsel table) but

had previously been unable to pick out appellant at a lineup which was held at a point in time closer to the abduction.

It seems clear from this evidence outlined above that we are faced with not just one but an entire series of highly suggestive pre-trial identification procedures. Concurrently with this series of suggestive displays the victim's ability to identify appellant has increased from a stage where she was not able to pick him out of a lineup and where she identify a picture as one which "looks like" appellant to a trial setting where she can positively identify appellant as one of her attackers.

When we weigh the relevant factors concerning the extent and number of suggestive identification procedures, the opportunity for independent identification at the time of the incident and the varying ability of the witness to identify appellant I do not believe we can find that there is no substantial likelihood the in-court identification was a product of the numerous suggestive factors with which we are faced here. *Foster* v. *California* (1969), 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402; *U.S.* v. *Gambrill*, 449 F. 2d 1148 (D. C. Cir., 1971). The judgment should be reversed and a new trial granted.

NOTE.—Reported in 299 N. E. 2d 824.