429 So.2d 1301 (1983)
STATE of Florida, Petitioner,
v.
Stanley WALKER, Respondent.
No. 82-1601.
District Court of Appeal of Florida, Fourth District.
April 13, 1983.
*1302 Jim Smith, Atty. Gen., Tallahassee, Joy B. Shearer, Asst. Atty. Gen., and James P. McLane, Certified Legal Intern, West Palm Beach, for petitioner.
Sheldon M. Schapiro, Fort Lauderdale, for respondent.
GLICKSTEIN, Judge.
The state has petitioned for a writ of certiorari, asserting that the trial court's order, suppressing the testimony of the victim relating to the identification of respondent, as well as any subsequent in-court identification of respondent by the victim, does not conform to the essential requirements of law and may cause material injury thereafter not remediable by appeal. We disagree and deny the petition because the appendix supports what the trial court obviously found; namely, an unnecessarily suggestive confrontation, which courts properly condemn.[1]
On the night of August 22, 1981, the victim in this case was terrorized by a group of young thugs who, with lights off, suddenly drove up behind and collided with the victim's moving vehicle as he innocently proceeded along a Broward County road. When the victim pulled his vehicle to the side of the road, the thugs robbed him of his watch, wallet and vehicle, using a gun in the process. The victim was able to reach a pay phone; and according to a Hollywood officer soon on the scene, the victim understandably could not be any more specific than to tell him that:
it was dark in the area. All [the victim] could see was the  the gun in the hand of the  one of the black males. He just described them to my recollection as three black males in their mid-twenties. Just average height and weight. He couldn't give me any further description as far as facial hair, clothing or anything of that nature.
Notwithstanding the obvious trauma, the victim did tell the Hollywood officer that he could identify the suspects from pictures. Three days later, a Fort Lauderdale detective showed him a photographic lineup of six individuals that included a picture of respondent, who had been apprehended in Fort Lauderdale during the early morning hours of August 23, 1981, in connection with a shoot-out in which the victim's vehicle was recovered. The detective later testified on deposition:
Q. What did [the victim] say when you showed him the photographs?
A. He said he could not make positive ID.
Q. Did he say whether any of the people looked familiar?
A. Uh, best of my memory, he, even before I showed him the line-up, he said he didn't think he could make identification and, um, I showed him the line-up and he said, no I can't pick anybody out.
Q. Did he say why he couldn't make an identification?
A. Uh, because he said at the time all he remembers was the gun and that there was, oh, three or four black males and he was scared and he really didn't look at anybody.
The victim was subpoenaed by the state for an adjudicatory hearing before a trial judge assigned to the juvenile division. The hearing, held on September 16, 1981, involved respondent in connection with a charge of possession of the victim's stolen vehicle. Therein it became apparent to the trial judge that there was considerable confusion as to what charges were or should be pending against respondent, who was present and represented by a public defender. The victim and the Fort Lauderdale officers who were involved in the early morning episode also were present at the hearing.
After asking the victim several questions, the trial judge went off the record; at that point the public defender inquired of the victim if respondent had been involved in *1303 robbing him. The victim then identified respondent as one of the suspects. The next day, the victim returned to the Hollywood police department and gave a statement which was followed by statements from the Fort Lauderdale officers who had witnessed the victim's identification. Respondent now having been identified, a probable cause affidavit for armed robbery was executed by the investigating Hollywood officer on October 5, 1981. On the same day, an information therefor relative to the victim's watch and wallet was filed and the subject motion and order followed.
As we picture the hearing of September 16, 1981, the victim apparently was within earshot of all the discussion which took place and in full view of respondent once the latter was brought into the room. The victim testified on deposition that he recognized respondent as one of the robbers as soon as he entered. But, in light of the victim's previous inability to identify respondent, we share the apprehension of the trial judge who later heard the motion to suppress the identification made under such suggestive circumstances.
There is no way to pass this confrontation off as a "show-up"; and even in Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), which permitted identification by the critically injured victim at her hospital bed, the court said:
The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.[6]
[6] See Wall, Eye-Witness Identification in Criminal Cases 26-40; Paul, Identification of Accused Persons, 12 Austl.L.J. 42, 44 (1938); Williams & Hammelmann, Identification Parades, Part I, [1963] Crim.L.Rev. 479, 480-481; Frankfurter, The Case of Sacco and Vanzetti 31-32.
Instead, we find some similarity in this case to Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1968), wherein the court held that the accused had been deprived of due process when he was subjected to a lineup, then a showup, then another lineup before the witness was convinced the accused was the robber. Here, the Fort Lauderdale detective's testimony vividly describes the inability of the victim to describe his attackers  and his reason therefor. Additionally, we see some correlation between the present facts and those in Simons v. State, 389 So.2d 262, 263 (Fla. 1st DCA 1980), wherein the state had the witness, on the day prior to his scheduled appearance, go to the courtroom where the accused was being arraigned on an amended information to see if he could recognize the accused. The court considered the subsequent in-court identification to be tainted. Id. at 266.
In Grant v. State, 390 So.2d 341, 343 (Fla. 1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981), the court said:
The primary evil to be avoided in the introduction of an out-of-court identification is a very substantial likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." Neil v. Biggers, 409 U.S. at 198, 93 S.Ct. at 382. But as the analysis has evolved, a suggestive confrontation procedure, by itself, is not enough to require exclusion of the out-of-court identification; the confrontation evidence will be admissible if, despite its suggestive aspects, the out-of-court identification possesses certain features of reliability. Manson v. Brathwaite, 432 U.S. 98, 110, 97 S.Ct. 2243, 2250, 53 L.Ed.2d 140 (1977). Hence the appropriate test is twofold: (1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; (2) if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification. Id. The *1304 factors to be considered in evaluating the likelihood of misidentification include
the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. at 199-200, 93 S.Ct. at 382.
(Emphasis supplied.) Given the "totality of the circumstances"[2] of this case, we cannot in good conscience vitiate the judgment of the trial judge and hold that her ruling did not conform to the essential requirements of law when there is support in the record for a conclusion that there was an absence of reliable features[3] and, therefore, a substantial likelihood of misidentification.
LETTS, C.J., and HURLEY, J., concur specially with opinions.
LETTS, Chief Judge, concurring specially:
I agree that certiorari should be denied in this case and it is perhaps excessive to have two special concurrences. However, I am concerned about two possible connotations for the future which I do not believe are intended.
First, I assume the majority does not mean to suggest that if a victim cannot immediately describe his attacker or recognize him from photographs, that the victim cannot do so later when the two actually meet face to face.
Secondly, I also assume the majority does not mean to exclude all pretrial confrontations, otherwise the opinion will have a far reaching effect on the entire system.
While I cannot deny the accuracy of the opinion's quotes and admit a certain inconsistency between those excerpts and the ones that follow, this hapless victim, a 38 year veteran employee of Eastern Airlines,[4] also answered questions under oath indicating instantaneous, unequivocal and positive identification of the defendant (although admittedly after the confrontation). Apparently, it was the other two co-perpetrators he did not get a good look at. Examples of his testimony include:
Q. Would it be safe to say that you knew that he was the party that was the defendant who was being charged?
A. Well, I  as soon as I saw him, He  I recognized him from being the one that took my watch, and also my billfold.
Q. When you say you recognized him ... (Pause) you hadn't seen him since August the 22nd, is that correct?
A. That's right. But I'll never forget that face.

Q. Was it  what about his face was it that you remembered? Was it the acne?
A. The scars and the protrude and, uh, of the face. Because I  he was the only I  I really put my  got to look at him close because he was in front of me and I got a good look at him.
Q. What level of certainty were you? In other words, were you absolutely a hundred percent positive....
A. Yes, sir.
Q. There was absolutely no doubt in your mind whatsoever?
A. (simultaneous) Still am. Still am, yes sir. [Emphasis added.]
... .
A. I sat there and looked right from across  he was sitting right there. I sat  stared at him. And he didn't even  he wouldn't look at me.

*1305 Q. (Simultaneous) How did you look at him before you were positive? Was it immediately, one second?
A. Well, it was immediately. It was immediately 'cause I ... .
Q. Immediately. One second after you saw him?
A. Well, I  whatever it is it wasn't... .
Q. Instantaneously?
A. Instantaneous. I looked up and saw his face. That was it.
... .
Q. Mr. McCord, are you positive of your identification of Stanley Walker?
A. I am.
Q. Okay, what part did he play during the armed robbery? You described three different individuals. Which one was Stanley Walker?
A. Stanley Walker is the individual who took my watch off my arm and took my billfold out of my left rear pocket and then went into my left pocket and got what was in there.
Q. Are you positive?
A. I am positive, yes.
The opinion speaks of the victim's "previous inability to identify the [defendant]" but in reality his problem was more an inability to give a detailed description and it was only the defendant's photographs he failed to identify, because he had not seen the defendant in person since the robbery, either at a lineup or otherwise.
Q. Looking back on it sir, do you think that the shock of the incident of being robbed and being involved in an auto accident, could have affected your ability to identify the defendant in any way, shape, or form?
A. No, I  I feel I could  I could identify him in person. I still feel  I feel I could possibly identify  identify the guy that with the gun in person, but not  I don't want to  as far as going to the photos, uh, I was in doubt about it. The photos weren't clear photos.
Finally, at the court hearing, as the record reflects, the subpoened victim did not recognize the defendant's name and did not know who would be there. At one point in these proceedings according to the victim, the public defender said to the judge (another witness indicates the public defender was inquiring of the victim) that his client had not known the car was stolen whereupon the victim, according to him, apparently gratuitously, interrupted and the following colloquy took place:
Q. What was [the judge] confused about?
A. Well now I understand that there were other cases that [the defendant] was involved with, and, uh, the public defender made the remark that, uh, this was when he was brought  the public defender says, he was only in the car. He didn't know it was a stolen car, and then I said, Your Honor, he is the one that took my watch and billfold off of me. And the, uh, and then the, uh, Public Defender give me a pretty strong long, and then, uh, later he says, judge, you can't hold this kid no longer, you kept him 15 days. And she said, well, I'm confused. I want to find out what we really got him on, because, uh, I don't know whether this is the case. In other words, it seems to me like maybe I shouldn't have been there. It was other cases he was involved with.
Q. Well, you were there, I assume for the theft of the car. It was your car... .
A. (simultaneous) Yeah.
Q. It was your car, and since you are the owner, they have to have your testimony.
All in all, I do not see much room for misidentification here. Moreover, there is not the faintest suggestion that the victim was subpoened to the hearing by law enforcement for the purpose of setting up a tainted confrontation. Frankly, had I been the trial judge, I would have ruled the other way. Moreover, many of the cited decisions *1306 dealing with the question of suggestive pretrial identification appear to me to play games to reach the result they want. We all know that notwithstanding any improperly suggestive pretrial identification, the error may be harmless if a proper in-court identification, supposedly sufficient to overcome the likelihood of misidentification, is given at trial. Adapting that admitted truth to the case at bar, it would appear that had this victim positively identified the defendant at his actual trial six months later we might well have upheld it regardless of (1) the passage of time, (2) the fact that the defendant might have been the only black in the court room, and (3) despite the victim's initial uncertainty as to identification. Yet because this particular positive identification took place at a preliminary hearing twenty five days later (although it was in court as distinct from out of court) it is found to be incurably tainted. I simply cannot fathom the rationale for the difference. On the other hand, the trial judge's ruling was a judgment call supported by precedent and certainly not a departure from the essential requirements of the law. Thus, while I disagree with it, I cannot, at this juncture, find that certiorari will lie.
Fortunately, society may still be rid of this apparently disgusting defendant for a spell, as the record reflects that he subsequently attempted to run over a police officer in the very car stolen.
HURLEY, Judge, concurring specially.
In addition to the compelling factual background of this case, I am persuaded by the holdings in Green v. Loggins, 614 F.2d 219 (9th Cir.1980) and United States v. Ballard, 534 F. Supp. 749 (M.D.Ala. 1982). Both cases involved accidental pretrial encounters. (In Green, a witness asked to be placed in protective custody and spent an hour in a holding cell with the defendant. Ballard, on the other hand, was identified by a witness who attended a series of preliminary court proceedings.) Because the primary purpose of judicial review of identification procedures is to ensure their reliability rather than to deter culpable police conduct, the court, in both instances, concluded that the accidental nature of the pretrial encounter did not dispose of the suggestiveness claim. Each court further found that the pretrial encounter was impermissibly suggestive and that under the Biggers standard,[5] the in-court identification was so unreliable that it should have been suppressed. Cf. Lauramore v. State, 422 So.2d 896 (Fla. 1st DCA 1982) (in-court identification allowed because suggestive pretrial parole revocation hearing was not so suggestive as to create a very substantial likelihood of irreparable misidentification); United States v. Massaro, 544 F.2d 547 (1st Cir.1976) (in-court identification approved when pretrial encounter was accidental and without suggestive circumstances), cert. denied, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977). As I read the record in the case now before us, the trial court had ample evidence to justify its finding that the pre-trial encounter was impermissibly suggestive. Consequently, I concur in the court's opinion.
NOTES
[1] See Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).
[2] See Neil v. Biggers.
[3] See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); and Baxter v. State, 355 So.2d 1234 (Fla. 2d DCA), cert. denied, 365 So.2d 709 (Fla. 1978).
[4] As the victorious and able defense lawyer noted: "Not exactly a fly-by-night."
[5] Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).