OPINION OF THE COURT
William D. Friedmann, J.
Defendants are charged with murder in the second degree (Penal Law § 125.25). This court conducted a combined Huntley/Wade hearing which was concluded on June 7, 1991. The People presented four witnesses, Sergeant Rudy Masseria and Detective Brian Dubecy of the 114th Precinct, and Sergeant Robert Prestinardi and Police Officer Manuel Maldonado of the 83rd Precinct. This court finds their testimony to be credible.
*878 RELEVANT FACTS
On June 26, 1990, Sergeant Rudy Masseria was assigned to investigate the shooting death of Fred Shapiro which occurred at Dr. Nick’s Transmission Shop, located at 60-13 Northern Boulevard, Queens, New York. When Sergeant Masseria, accompanied by Detective Dubecy, arrived at the crime scene, he interviewed the decedent’s brother, Howard Shapiro, an eyewitness to the shooting. Howard Shapiro stated to them that at about 2:15 p.m. on June 26, 1990, two men, whom he described, entered the shop and asked the deceased if he could fix a flat tire. Howard Shapiro joined the conversation informing the two men that they could go next door to have the tire fixed. At this point, one of the men pulled a gun from his pants, stated "you are going to die”, and fired one shot which fatally wounded Fred Shapiro. Both men then fled.
During his investigation of the homicide, Sergeant Masseria discovered that a then anonymous[1] phone call had been received by Detective Rose, informing him that a Chevy Blazer was involved in this homicide. The Blazer was described as white, having a smashed rear window, tinted windows and a chrome light bar. Furthermore, the anonymous caller stated that at the time of the homicide, the Blazer arrived and parked about one block away from Dr. Nick’s Transmission and that it was driven by three hispanics, two of whom exited and then returned a short time later.
As a result of a city-wide alarm being put out on this Blazer, the police discovered that a Blazer matching the above description was located at 381 Troutman Street and the area was staked out. Detective Dubecy was dispatched to this location where he observed Jorge Cedano entering the Blazer. Shortly thereafter, Detective Dubecy stopped the Blazer. Jorge Cedano was taken to the 114th Precinct in Queens where he was read his Miranda warnings and interviewed by Sergeant Masseria. After the interview, Jorge Cedano gave a videotaped statement. His statements, in essence, implicated an "RQ” and a "Flacco” in the shooting. Cedano stated that Flacco told him, "I shot somebody” when he returned to the Blazer after the shooting. Cedano did not know RQ’s real name but identified a photo of the defendant, Richard Reyes, as being RQ.
The defendant, Richard Reyes, was then picked up by *879 Sergeant Masseria and interviewed by Detective Dubecy. Reyes’ statement coincided with Cedano’s. Reyes described Flacco as having curly hair and as always hanging out on Troutman Street. Sergeant Prestinardi proceeded to Troutman Street, whereupon he was informed by a prostitute that she knew Flacco, that he had recently shaved his head and that he hung out at Troutman Street and Wycoff Avenue. Ten minutes later, Sergeant Prestinardi arrived at the location and observed a tall male hispanic with a shaven head, who matched the description given by defendant Reyes exactly.[2] Sergeant Prestinardi arrested him.
Flacco (defendant Vincent Martinez) was interviewed at the 114th Precinct. After giving routine pedigree information, he was advised of his rights and refused to make any statement other than that he was with defendant Reyes on June 26, 1990, at Jefferson and Troutman Streets.
Lineups were conducted on June 28, 1990. Cedano was placed in the first lineup which was viewed by Sal Licata. Licata could not make any positive identification.
Richard Reyes was placed in a second lineup. Prior to the lineup, the deceased brother, Howard Shapiro was kept separate from the lineups and suspects. At 1:37 A.M., Shapiro, who was crying, and very nervous, viewed the lineup and selected Reyes and another individual. He stated that he was not sure, but thought he was one of the two men that was present but not the shooter. At 2:50 A.M., Vincent Martinez was placed in a third lineup. Howard Shapiro identified Martinez as the shooter, and said that he recognized the face and the body, but that he (Martinez) previously had an afro.
At 3:30 A.M., the second lineup including Reyes was reconstructed. The position and makeup of the individuals in the lineup were not changed and the same fillers were used. This time Reyes, also known as RQ, was picked out by Shapiro as the other perpetrator. Shapiro stated, "that’s the guy, but he’s not the shooter.”
It should be noted that on June 26, 1990 (the day of the homicide), Howard Shapiro had selected three photos out of several books of photographs of hispanic men in the 114th Precinct, that looked similar to the perpetrators, none of whom were the three men involved in this incident.
*880 defendants’ contentions
Defendants, Martinez and Reyes, move to preclude codefendant Jorge Cedano’s identification of them contending that identification procedures, lineups and photo identification were unduly suggestive.
people’s contentions
The People contend that the arrest of Martinez and Reyes was based on probable cause and that their resulting lineups were fair, not unduly suggestive and therefore should be admitted at trial.
CONCLUSIONS OF LAW
This court finds, inter alla, that probable cause did exist prior to the arrest of defendants Martinez and Reyes.
WADE ISSUE
Defendants, claiming that improper identification testimony may be offered against them, have moved to exclude the testimony of Howard Shapiro on the grounds that the procedures would not be admissible because of an improperly made prior identification of the defendants by the prospective witness.
Specifically, the defendant Reyes contends the repeated lineup with the same defendant and fillers was unduly suggestive and should be suppressed.
The People have the burden of going forward to show that the pretrial identification procedure was not constitutionally impermissible. Defendant however, bears the burden of establishing, by a preponderance of the evidence, that the procedure was impermissible. If such procedure is shown to be improper, the People have the burden of proving, by clear and convincing evidence, that the prospective identification testimony, rather than stemming from the unfair pretrial confrontation, has an independent source.
The court finds that the. lineups were based on arrests supported by probable cause. The lineups themselves were not unduly suggestive. The composition of the lineups contained persons similar to the defendants’ descriptions and likenesses. The court finds the lineups were held in a proper manner and the court therefore denies suppression. In Foster v California (394 US 440 [1969]), the United States Supreme Court held *881 that where a witness is shown two successive lineups, and the suspect was the only participant present in both lineups, the second lineup was held to be unduly suggestive. However, the case at bar is easily distinguished from Foster v California (supra), in that in this case, the same fillers, along with the defendant Reyes, were presented in the same order in both lineups. In essence, the same lineup was repeated. The court finds the lineups in question were not unduly suggestive, and were properly conducted by the police. The court further finds that under these circumstances, to wit: the extreme emotional disturbance of the witness, it is proper to reconstruct the lineup and allow the witness to view it after he has composed himself. Therefore, this repeat lineup is devoid of police misconduct and did not violate defendant’s constitutional rights.
Cases dealing with the general topic of a witness’s prior identification or misidentification seem to be split in their holdings. The Supreme Court, in United States v Wade (388 US 218 [1967]) holds photo identification of the suspect prior to lineup was a factor of independent source. If a witness failed to identify the defendant at a prior lineup or photo procedure, this can be a factor in negating the independent source or reliability of an identification, if the defendant was not selected by the witness (United States v Gambrill, 449 F2d 1148 [DC Cir 1971]; United States v Hinkle, 448 F2d 1157 [DC Cir 1971]).
Some cases have found that the witness’s earlier failure to identify is irrelevant to the reliability of later identification. In United States v Briggs (700 F2d 408, 413 [7th Cir 1983]), a witness’s prior inability to identify a defendant goes to the credibility of the in-court identification and not to its admissibility. Here, it is clearly a question of fact for the jury to decide upon, once all the evidence is presented. The victim’s misidentification, or inability to identify the defendant previously and the impact this has on his credibility is clearly a matter for the jury’s consideration.
Research has revealed that there are no cases directly addressing the validity of successive repeats of identical lineups to be viewed by an eyewitness who selects the suspect in the first lineup along with another filler, and then in the second lineup positively identifies the suspect. Foster (supra) is the only case which dealt with successive lineups, but it dealt with the situation where the suspect was the only individual that was present in both lineups, which was held to be unduly *882 suggestive, and the identification void. In distinguishing the case at hand, it can be said that the lineup was not unduly suggestive because the same identical lineup was shown two times, with no variations in the fillers, suspect, or the order of presentation.
The propriety of the repeat Reyes lineup was proper under the circumstances where the eyewitness (victim’s brother) was overcome with emotion and was crying during the first lineup. The repeat lineup was identical to the first and was held after the eyewitness was able to compose himself. There is no evidence of wrongdoing by police or of undue suggestiveness. Therefore, the motion to suppress identification testimony is denied in its entirety.

. Subsequently it was discovered that this phone call was made by Sal Licata (a person whose business is across from Dr. Nick’s).

. Reyes described Flacco as a junky, thin build, hispanic and a pockmarked face.