■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH MALLOY, Appellant. — Judgment, Supreme Court, Bronx County, rendered June 22, 1979, convicting defendant, after a jury trial, of robbery in the first degree, criminal possession of stolen property in the first degree, and unlawful imprisonment in the second degree, affirmed. Ross, J.P., and Lupiano, J., concur in a memorandum by Lupiano, J.; Bloom and Fein, JJ., concur in a separate memorandum by Fein, J., and Carro, J., dissents in a memorandum, all as set forth as follows.

Lupiano, J. Victor Licciardi, Jay Kopp and Dean Kopp, employees of Elko Processors, Inc., were transporting a load of raw furs by truck to Elko's Bronx warehouse on the evening of March 30, 1978. A blue van blocked their path. Defendant jumped out of the van from the driver's side, while two accomplices emerged from the passenger's side. The three perpetrators did not wear masks, and the lighting provided by nearby street lights was good. Defendant, displaying a gun, opened the truck door on the driver's side, which triggered the vehicle's burglar alarm. Licciardi was compelled to turn off the alarm by defendant who pointed the gun at Licciardi's head. The Kopp brothers were taken from the truck, and after being handcuffed, were ordered to lie face down in the back of the van. Licciardi was ordered by defendant to leave the truck and was then interrogated by defendant as to the particulars of the truck's alarm system and padlock. During this interrogation, the participants stood two to four feet apart. Licciardi was then placed in the van in a similar manner. Thus, all three victims had a full-face view of defendant, the observations by the Kopp brothers being of

some two and one-half to three minutes duration, and the observation by Licciardi being of some five and one-half to eight minutes. Defendant was described by the three victims to the police as being five feet six inches to five feet ten inches in height, weighing 135 to 150 pounds, with a medium build and possessing short dark, bushy hair, a mustache and a dark complexion. The victims estimated that defendant was between 30 and 35 years old and was possibly of Italian or Hispanic extraction. During the subsequent police investigation, the victims, individually, were shown a photographic array, but could not identify anyone. Defendant's photograph was not contained in this array. One week later, the victims, individually, were shown a second photographic array which contained two pictures of defendant. This photographic array also contained two pictures of another individual and 10 pictures of 10 other individuals. All three victims tentatively identified defendant. The investigation thus focused on defendant. Some two weeks later, the victims were shown a third array of photographs consisting of 14 surveillance photographs of defendant and an old "mugshot." Licciardi identified defendant, commenting: "He even holds the cigarette in his mouth the same way." The Kopp brothers also identified defendant, but all three wanted a personal view of defendant to be certain. Some three weeks thereafter, a fourth array of photographs was shown — photographs of defendant taken under surveillance. The victims commented on the similarity of defendant's build, his jacket, and the blue van depicted in the photographs to one of the perpetrators of and the van utilized in the armed hijacking. Defendant was subsequently arrested, asked for and obtained permission to call an attorney, but was apparently unsuccessful in reaching the one he called. At the lineup held soon after the arrest, defendant was identified by the three victims. Assuming the lineup identification of defendant by the three victims after his arrest was tainted by the failure of the authorities to honor defendant's alleged request for counsel, the fact remains that there was an independent, untainted source for the in-court identification of defendant by the three victims. The in-court identification is not tainted by the suggestive third and fourth photographic arrays and is fully supported by the tentative identification of defendant by all three victims of defendant's photograph in the second array. The victims were not mere bystanders and, as victims, had every reason to pay strict attention to defendant, the perpetrator, who was armed and appeared to be the spokesman for the trio of hijackers. Licciardi stood face to face with defendant for some three to five minutes, and overall had some five and one-half to eight minutes observation of defendant in good lighting. The description of defendant supplied by the victims was detailed. To reiterate, the Kopp brothers had some two and one-half to three minutes in which to observe defendant during the commission of the crime. The record clearly displays the seriousness with which these three citizens approached the task of initially identifying and then clarifying their identification of defendant as one of the three perpetrators. They clearly were not precipitant in their identification and took great care to insure that they did not accuse the wrong man. Succinctly stated, the three victims selected defendant's picture out of a fair photo array (the second photographic array) only two weeks after the hijacking and resisted the suggestiveness of the later arrays. This is a case in which three victims of an armed hijacker got a "good long look" at their assailant under optimum lighting conditions. Over the six-week period subsequent to the crime, these three eyewitnesses identified defendant as the gun-wielding hijacker and never retracted that identification or identified anyone else, although they had several opportunities to do so. There is simply no substantial

likelihood of an irreparably mistaken identification in this case. "Reliability of identification is to be tested by a determination of whether under a totality of the circumstances there is 'a very substantial likelihood of irreparable misidentification.' *Simmons v United States* (390 US 377, 384); *Manson v Brathwaite* (432 US 98) and *Neil v Biggers* (409 US 188, 199-200) provide us with suggested guidelines for the determination of reliability such as 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation' " *(People v Gonzalez,* 61 AD2d 666, 670). All of the aforementioned elements on this record emerge on the plus or positive side, indicating a reliability more than ordinarily difficult to challenge.

Fein, J. I concur in result. The careful and detailed dissent well portrays the pertinent facts and the problems created by the zeal of the police in setting up the third and fourth photo displays. These impermissible showups did not so taint the identification by the Kopp brothers as to render their in-court identification of defendant inadmissible. The insistence of the Kopp brothers and the other victim, Licciardi, that they could not make a positive identification without a visual confrontation with the defendant is powerful evidence that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive" *(Neil v Biggers,* 409 US 188, 199). The circumstances surrounding the commission of the crime, as carefully described in the dissent, provided the "independent source" required by the guidelines laid down in *Neil v Biggers (supra).* Measured against those guidelines, the independent identifications by Licciardi and the Kopp brothers possessed "sufficient aspects of reliability" *(Manson v Brathwaite,* 432 US 98, 106) to render them admissible. The misuse of photographs by the police during the identification procedure is not always fatal *(Simmons v United States,* 390 US 377, 383-384).

Carro, J. (dissenting). I would grant the motion to suppress the in-court identifications of the witnesses Jay Kopp and Dean Kopp and would reverse and remand for new trial, on the ground that the third and fourth photographic identification proceedings made it clear that the police believed the defendant to be the perpetrator and made it almost inevitable that he would be identified. These photographic "show-ups" were so impermissibly and unnecessarily suggestive and so tainted the later identifications made by two of the three eyewitnesses as to overbear their original observations and create "a very substantial likelihood of irreparable misidentification". On March 30, 1978 at about 6:10 P.M., Victor Licciardi, Jay Kopp and Dean Kopp were proceeding from Manhattan to The Bronx in their employer's truck, delivering furs. Mr. Licciardi was driving. After crossing the Willis Avenue bridge, they entered the service road, when a blue van pulled alongside and Jay Kopp said, "He's got a gun". The van pulled in front, cutting them off, and Licciardi stopped the truck. Three men got out of the van. The driver, allegedly the defendant, was holding a gun and went to the driver's side of the van. The other two men went to the passenger side. One of them told Jay Kopp to open the door and he refused. The defendant opened the driver's door and the alarm went off. He pointed the gun at Licciardi and said, "shut the alarm off", which was done. The defendant then told Licciardi to get out and told Jay Kopp to open his door. Jay complied and one of the other men told Jay and Dean to get out. The other two men then handcuffed the Kopp brothers and placed them in the rear of the van. Licciardi meanwhile got out of the driver's side of the truck. In response to

questions by the defendant, he explained how to work the alarm and that while he had a key to the padlock in the back, he did not have the master key, so that the alarm would go off if he tried to open the door. Licciardi was then placed into the van with the Kopp brothers. While he stated he couldn't recall, he estimated his conversation with defendant to have taken three, four or five minutes. It was dusk, and there were street lights in the area, so that the lighting conditions were reasonably good. The three witnesses were later released in Nassau County. Shortly after the incident, they described the driver of the van to police, as follows: "V. Licciardi: 5'6", 130 lbs, medium build, dark hair, thin moustache, band-aid over his nose, blue jacket, pants and silver gun. J. Kopp: 5'7", 30 years of age, medium build, 150 pounds, black short hair, dark bushy moustache, dark complexion, possibly Hispanic, dark clothing with light colored jacket. D. Kopp: 30 to 35 years of age, 5'8" to 5'10", medium build, dark long hair, probably Italian, with a small silver gun." The police subsequently conducted four separate photo identification procedures: On April 4, 1978, an array of 20 to 30 photographs was shown separately to the witnesses. No identification resulted. Defendant's photograph was not included. On April 11, 1978, an array of 14 photos, including two of defendant, was shown separately to the witnesses. The two pictures of defendant had been taken at different times and his appearance had changed substantially. Licciardi picked one of the photos of defendant and stated that it looked like the perpetrator, "but his hair was trimmer and his moustache was trimmer." He requested to see defendant "face to face". Neither of the Kopp brothers made an identification, but both stated they would know the perpetrator if they saw him in person. On April 24, 1978, one black and white parole photograph of defendant and 14 black and white surveillance photos taken of him on April 20, 1978 were shown separately to the three witnesses. Licciardi stated "that's the guy"; Dean Kopp said it looked like him, but he wasn't sure; and Jay Kopp said he could not make a positive identification until he saw the person face to face. On May 17, 1978, the fourth photo procedure took place. Eighty-five* color surveillance photos — several of which showed defendant wearing a jacket similar to that worn by the perpetrator and several of which showed him in proximity to a blue van similar to the van used in the robbery — were separately exhibited to the three complaining witnesses. Victor Licciardi stated he recognized the defendant as the perpetrator. Dean and Jay Kopp did not make an identification but again reiterated they would like to see the defendant in person. The defendant was arrested on May 18, 1978, and a lineup was conducted that morning. The defendant was identified by Victor Licciardi and Dean Kopp. Jay Kopp pointed to the defendant and said, "that's the best one," but stated that he did not want to make a positive identification until he was sure in his own mind that this was the person. All three of the eyewitnesses positively identified the defendant at hearing and trial. The suppression court correctly held, and this court affirms, that the first and second photo displays were fair and that the third and fourth displays were highly suggestive and violated due process. Based upon its analysis pursuant to the guidelines set forth in *Neil v Biggers* (409 US 188), the suppression court found, and the majority affirms, that an "independent source" existed for the identifications made by all three complaining witnesses and that any taint which resulted from the third and fourth photo displays was not responsible for the later identifica-

---

\* The testimony, briefs and decision below refer to 95 photos. However it appears that only 85 were placed in evidence and are part of the record.

tions of defendant. I disagree as to the witnesses Jay and Dean Kopp. In *Simmons v United States* (390 US 377, 383-384), the Supreme Court stated: "It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. * * * This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification. * * * we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Here, in their anxiety to make sure the "right man" (the defendant) was identified, the police, unhappy with the tentative identification made by Licciardi at the second photo display, that it "looked like" the perpetrator, and with the failure of the Kopp brothers to make any identification, arranged a third display emphasizing defendant. This showing consisted of 15 black and white pictures of defendant, one of them a full face close-up obtained from the Division of Parole. Upon reviewing these, Licciardi immediately identified Molloy, but the Kopp brothers still failed to make an identification. The zeal of the police who were convinced that Molloy was the perpetrator, apparently overflowed, for they next presented the witnesses with a total of 85 color surveillance photographs, many of them not only depicting defendant Molloy, but showing him with a van and wearing a jacket comforming to the descriptions of those used in the robbery. "The suggestive elements in this identification procedure made it all but inevitable that [the witnesses] would identify petitioner whether or not he was in fact 'the man'. In effect, the police repeatedly said to the witnesses, 'This is the man'." *(Foster v California,* 394 US 440, 443.) The third and fourth photo displays, which were nothing more than photographic showups, having been found highly suggestive and in violation of due process, the question becomes "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive" *(Neil v Biggers,* 409 US 188, 199, *supra).* "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability" *(Manson v Brathwaite,* 432 US 98, 106). The factors to be considered in evaluating this reliability and the likelihood of misidentification, as against the corrupting effect of the suggestive procedure, have been restated in *Neil v Biggers (supra,* p 199) as including the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation (see, also, *United States v Wade,* 388 US 218, 241; *Manson v Brathwaite, supra,* p 114). An analysis based upon these factors must be made since, once the two photo showups were held improper the in-court identification by Jay Kopp and Dean Kopp, though not per se

excludable, should not have been received in evidence without a correct determination that they were not tainted by the illegal procedure, but were of independent origin *(Gilbert v California,* 388 US 263, 272; *People v Ballott,* 20 NY2d 600, 606). The burden was upon the People to prove by clear and convincing evidence that the in-court identifications had a basis independent of and untainted by the improper and suggestive procedures, i.e., an "independent source" *(United States v Wade, supra,* p 240; *People v Ballott, supra,* p 606; *People v Fuller,* 71 AD2d 589, 590). The following, pursuant to the factors set forth in *Biggers,* suggests that the People have failed in that burden as to the witnesses Jay Kopp and Dean Kopp. 1. The opportunity to view: While the Kopp brothers testified that the portion of the incident during which they had the opportunity to observe the defendant (allegedly the main perpetrator) from the time the van pulled alongside to the time they left the truck, took "five, six minutes" or "five to ten minutes," the testimony of the three complainants in describing the occurrence shows quite clearly that the actual passage of time was substantially less, probably less than one minute. For example: Jay Kopp: "A. When I saw them get out of the van I locked my door. The defendant went to the driver's side and opened the door and the alarm went off. There was another guy on my side, told me to open the door; I wouldn't open the door. The defendant then told the driver, 'shut it off', meaning the alarm, which he did. He shut off the alarm. And he says to me, 'open that door'. I opened the door and from then, then the other guy told me to go to the back of the van, and that was it". 2. The degree of attention: The quality of their observations of the defendant was affected not only by the shortness of time he was seen, but also by the simultaneous, distracting appearance, at the passenger side of the truck, of at least one other perpetrator, demanding that the door be opened. 3. The accuracy of the description: The descriptions varied from minimum height of 5 foot 6 inches to a maximum of 5 foot 10 inches; the weight from 130 to 150 pounds; from short hair to long hair; from thin moustache to bushy moustache to no mention of a moustache; and from a Band-Aid over the nose to no Band-Aid. 4 and 5. The witnesses' level of certainty; the time between the crime and the confrontation: Jay Kopp did not positively identify the defendant until the hearing on the motion to suppress evidence, which commenced December 11, 1978, almost eight and one-half months after the crime. Dean Kopp first made a positive identification at the lineup, held May 18, 1978, approximately seven weeks after the incident. Under all of the circumstances of this case, including the above factors, it is clear to me that the in-court identifications of these two witnesses were irretrievably tainted by the two impermissible photographic procedures which created a very substantial likelihood of irreparable misidentification, resulting in a violation of due process of law.